524 So.2d 403 (1988)
Oscar TORRES-ARBOLEDO, Appellant,
v.
STATE of Florida, Appellee.
No. 66354.
Supreme Court of Florida.
March 24, 1988.
Rehearing Denied May 24, 1988.
*406 James Marion Moorman, Public Defender and Robert F. Moeller, Asst. Public Defender, Tenth Judicial Circuit, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen. and William I. Munsey, Jr., Asst. Atty. Gen., Tampa, for appellee.
EHRLICH, Justice.
Oscar Torres-Arboledo, a prisoner under sentence of death, appeals his convictions for attempted armed robbery and first-degree murder and the sentences attendant thereto. We have jurisdiction, article V, section 3(b)(1), Florida Constitution, and affirm the convictions and sentences.
According to testimony presented at trial, on June 24, 1981, Torres-Arboledo, an illegal alien from Colombia, and another "Spanish-speaking guy" met Raymond Jacobs in a bar. Jacobs and his girlfriend, Desiree Bell, were riding around in Bell's parents' car when Jacobs stopped at the bar to get cigarettes. Using "broken language" Torres-Arboledo offered Jacobs money for a ride. The two Spanish-speaking men got in the car with Jacobs and Bell and by using hand signals and pointing directed them which way to go. Eventually, a third Spanish-speaking man was picked up. After picking up the third man, Jacobs drove on until the men motioned for *407 him to stop at a church. The trio got out and Torres-Arboledo asked Jacobs and Bell to wait. While Jacobs and Bell waited, the trio went into Pat's Paint and Body Shop. George Williams, who was working in the shop, saw the trio approach the owner Patricio Lorenzo. It appears from the testimony that the trio attempted to take Lorenzo's gold chain and medallion worth approximately $400. When Lorenzo refused to give up the chain, he was shot twice, once in the arm and once in the chest. Although no one witnessed the shooting, according to Williams Torres-Arboledo was in possession of the gun immediately after the shooting. Jacobs and Bell testified that when the trio returned to the car, Torres-Arboledo had the gun in his hand and ordered Jacobs to "go." When the car eventually stalled, Jacobs and the three Spanish-speaking men jumped out and ran. One of the three Spanish-speaking men was apprehended at the scene. He was granted immunity in exchange for his testimony; however, at the time of the trial, this participant had returned to Colombia and could not be found. The third Spanish-speaking man was never apprehended and did not testify at Torres-Arboledo's trial. Torres-Arboledo was eventually charged with attempted armed robbery and first-degree murder; he was extradited from California where he was serving a twenty-seven-year sentence in connection with a California murder which occurred subsequent to this offense.
The jury found Torres-Arboledo guilty of attempted armed robbery and first-degree murder and recommended a life sentence. The trial court overrode this recommendation and imposed the death penalty, finding two aggravating circumstances and no mitigating circumstances. The trial court also departed from the recommended guidelines sentence for the attempted armed robbery, imposing the statutory maximum of fifteen years.

GUILT PHASE
Torres-Arboledo's first claim deals with testimony elicited from two state witnesses concerning statements made by the victim prior to his death. Torres-Arboledo argues that statements made by Lorenzo at the hospital to emergency room physician Dr. Mallea and statements made to George Williams soon after the shooting were inadmissible hearsay.
On direct examination Dr. Mallea, who treated Lorenzo in the emergency room, was allowed to testify, over objection, that Lorenzo told him "a couple of black people tried to steal his medal and shot him." The state maintains that the trial court properly admitted this statement under section 90.803(4), Florida Statutes (1985), as a statement made for the purpose of medical diagnosis or treatment. Torres-Arboledo contends that only the statement that Lorenzo was shot was admissible as a statement made for the purpose of medical diagnosis or treatment. The trial court found the entire statement to Dr. Mallea admissible under this exception to the hearsay rule. Under section 90.803(4) of the Florida Evidence Code, statements which describe the inception or cause of an injury are admissible if they are reasonably pertinent to the diagnosis or treatment of the injury. However, so called statements of fault do not qualify. See Ehrhardt, Florida Evidence, § 803.4 (2d ed. 1984). With this distinction in mind, we agree with the appellant that the statement that Lorenzo was shot was admissible because it was reasonably pertinent to the diagnosis or treatment of his wounds; but, the statement that black people tried to steal his medallion was not admissible, as it constitutes information which was not reasonably pertinent in medical treatment.
The state maintains that even if portions of the statement to Dr. Mallea were not admissible under section 90.803(4) the entire statement was admissible as a dying declaration under section 90.804(2). We cannot agree. Before a hearsay statement is admissible as a dying declaration the court must be satisfied that the deceased declarant, at the time of its utterance, knew that his death was imminent and inevitable. Teffeteller v. State, 439 So.2d 840, 843 (Fla. 1983), cert. denied, 465 U.S. 1074, 104 S.Ct. 1430, 79 L.Ed.2d 754 *408 (1984); Lester v. State, 37 Fla. 382, 385, 20 So. 232, 233 (1896). "Whether a proper and sufficient predicate has been laid for the admission in evidence of a dying declaration is a mixed question of law and fact and will not be disturbed unless clearly erroneous." Teffeteller, 439 So.2d at 843-44. The trial court in this case specifically ruled that the statement to Dr. Mallea did not qualify as a dying declaration. We cannot say that this ruling was clearly erroneous. Thus, we conclude that that portion of Lorenzo's statement to Dr. Mallea describing those who shot him and the circumstances under which he was shot were not admissible under either exception to the hearsay rule urged by the state. However, since the improperly admitted statement that the perpetrators were black and that they tried to take Lorenzo's medallion was merely cumulative to the testimony of George Williams which we find was properly admitted, admission of the statement to Dr. Mallea was harmless beyond a reasonable doubt.
George Williams testified that while working in the shop he saw three black men approach Lorenzo. Williams did not witness the attempted robbery or the shooting, but testified that after he heard a shot he went to see what happened. He saw Lorenzo running towards the shop office. Williams then heard a second shot and yelled "Patricio, what is the matter?" When Torres-Arboledo pointed the gun at Williams, Williams threw a sprayer and then a tube at him. After the three men ran from the building, Williams asked Lorenzo "What happened?" Lorenzo responded that "They [the three black men] wanted to take the chain away from me." The trial court properly admitted this statement as an excited utterance under section 90.803(2). It is clear from the record that Lorenzo's statement to Williams was made, if not immediately after the shooting, very shortly afterwards while Lorenzo was under the stress of having just been shot.
Torres-Arboledo's next point on appeal involves defense counsel's unsuccessful attempt to impeach state witness Jacobs by questioning him concerning prior arrests for obstructing justice and giving false information. During cross-examination, defense counsel asked Jacobs whether he had been arrested for obstructing justice and giving false information. The trial court sustained the state's objection and informed defense counsel that he could ask whether Jacobs had ever been convicted of a felony or a crime involving dishonesty or false statement, as provided under section 90.610(1), Florida Statutes (1985). Section 90.610(1) provides:
A party may attack the credibility of any witness, including an accused, by evidence that the witness has been convicted of a crime if the crime was punishable by death or imprisonment in excess of 1 year under the law under which he was convicted, or if the crime involved dishonesty or a false statement regardless of the punishment... .
Defense counsel proceeded to ask Jacobs if he had ever been convicted of a felony but never asked about convictions involving dishonesty or false statement. In fact, counsel conceded that he did not know if Jacobs had been convicted of obstructing justice and giving false information.
We also reject Torres-Arboledo's claim that questions concerning the arrests were admissible to show bias. When charges are pending against a prosecution witness at the time he testifies, the defense is entitled to bring this fact to the jury's attention to show bias, motive or self-interest. Fulton v. State, 335 So.2d 280 (Fla. 1976). However, it is clear from the record that defense counsel never suggested that charges were pending in connection with these arrests; nor did he urge the trial court to allow him to question Jacobs to show bias in connection with pending charges. Under these circumstances, the questions concerning prior arrests were properly excluded.
Torres-Arboledo's third point on appeal deals with testimony of the victim's daughter, Maria Ferrer. Ferrer was called by the state for the primary purpose of identifying her father's medallion. At the beginning of her testimony, when asked "Do you know a man by the name of *409 Patricio Lorenzo," Ferrer began crying on the witness stand. Defense counsel asked to approach the bench and the court ordered the jury to be taken from the courtroom. Ferrer apologized for the outburst. After she regained her composure the jury returned to the courtroom and she resumed her testimony. Although defense counsel objected to the outburst arguing it was prejudicial to his client, no motion for mistrial was made. We conclude that the admission of Ferrer's testimony identifying the medallion was not error, see Mills v. State, 462 So.2d 1075 (Fla.), cert. denied, 473 U.S. 911, 105 S.Ct. 3538, 87 L.Ed.2d 661 (1985), and note that much of the testimony now challenged went unobjected to at trial. Therefore, it is the outburst itself which is the focus of this claim. In a case such as this, this Court cannot glean from the record how intense the outburst was nor the degree to which it may have affected the jury. Therefore, these determinations must first be made by the trial court. See Justus v. State, 438 So.2d 358, 366 (Fla. 1983), cert. denied, 465 U.S. 1052, 104 S.Ct. 1332, 79 L.Ed.2d 726 (1984). However, because there was no motion for a mistrial, there is no record determination by the trial court as to whether this outburst was so prejudicial as to require one. Under the circumstances, we agree with the state that this claim has not been properly preserved for our review.
As his fourth claim, Torres-Arboledo maintains that the trial court erred in "requiring him to stand trial in identifiable jail clothing." We find this claim to be without merit. An individual accused of a crime cannot be forced, over his objection, to stand trial in identifiable prison clothing. Neary v. State, 384 So.2d 881, 885 (Fla. 1980); Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). However, the appellant in this case was not compelled to stand trial in his prison uniform. Any compulsion by the state was negated by Torres-Arboledo's failure to make an objection to the court as to being tried in prison clothing. See Estelle, 425 U.S. at 512, 96 S.Ct. at 1697. It is clear from the record that no objection was raised concerning the prison attire; nor did defense counsel seek a continuance until civilian clothing could be obtained. Counsel merely placed on the record the fact that the defendant was clad in a blue jumpsuit with the words "County Jail" written on the back. Defense counsel explained that the shirt provided the defendant had been thrown in the laundry basket and the defendant was unable to wear it. Such a factual recitation unaccompanied by an objection or request for a continuance until more appropriate attire could be obtained was insufficient to support a finding of compulsion on the part of the state.
Further, it is the extent to which the defendant's clothing is communicative of his status as a prisoner which determines whether or not he is denied a fair trial. United States v. Dawson, 563 F.2d 149 (5th Cir.1977). There is no evidence or allegation that any juror saw the words "County Jail" on the back of the jumpsuit. In fact, the bailiff was instructed to see to it that the jurors did not see the defendant's back. Therefore, even if state compulsion were present, there is no reason to assume that the prison attire was "identifiable," thus depriving Torres-Arboledo of a fair trial.
Torres-Arboledo next claims that the trial court erred by failing to conduct a record inquiry to determine whether he voluntarily, knowingly and intelligently relinquished his right to testify. Torres-Arboledo characterizes the right to testify as a "fundamental constitutional right" which he equates with such personal fundamental rights as the right to counsel, the right to trial by jury, the privilege against self-incrimination, and the right to be present at all crucial stages of a criminal prosecution.
Torres-Arboledo relies heavily on the Colorado Supreme Court's recent decision in People v. Curtis, 681 P.2d 504 (Colo. 1984), and urges this Court to adopt the approach taken by that court. The Colorado Supreme Court concluded in Curtis that the defendant in a criminal prosecution has a fundamental constitutional right to testify in his own defense under the due process clauses of the Colorado and federal *410 constitutions. 681 P.2d at 509. The Curtis court went on to conclude that the right to testify is so fundamental that the effectiveness of its waiver must be tested by the same constitutional standards applicable to waiver of the right to counsel established by the United States Supreme Court in Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Thus, the Colorado court held that "waiver of the right to testify must be voluntary, knowing and intentional, and the existence of effective waiver should be ascertained by the trial court on the record." 681 P.2d at 515.
The state urges this Court to adopt the position taken by the Second District Court of Appeal in Cutter v. State, 460 So.2d 538 (Fla.2d DCA 1984). When confronted with this issue, the Second District Court in Cutter rejected the position taken by the Colorado Supreme Court in Curtis instead opting for the approach taken by the Wisconsin Supreme Court in State v. Albright, 96 Wis.2d 122, 291 N.W.2d 487, cert. denied, 449 U.S. 957, 101 S.Ct. 367, 66 L.Ed.2d 223 (1980). In Albright, which antedated Curtis, the Wisconsin Supreme Court, as did the Colorado Supreme Court, concluded that a defendant has a constitutional right to testify on his own behalf under the due process clause of the United States Constitution. However, unlike the Colorado Supreme Court, the Albright Court concluded that this "important" constitutional right does not fall within the "category of `fundamental' rights, which can only be waived in open court on the record by the defendant." 96 Wis.2d at 130, 291 N.W.2d at 490-91. The Wisconsin court based this holding on its conclusion that "the right to testify, as distinguished from those rights considered to be so fundamental as to be personal to the defendant, does not go to the very heart of the adjudicatory process." Id. Consistent with this view, the Second District Court in Cutter held that:
Unlike the right to forego assistance of counsel and certain other rights, ... the right to testify is not so fundamental and personal that it can only be waived by the defendant; it may be waived by the defendant's attorney in the absence of express disapproval on the record by the defendant during the pretrial or trial proceedings... . [Therefore] an accused waives his right to testify, if, after having the right explained to him by counsel, he acquiesces in his attorney's advice not to testify. If he does not agree with his attorney, he must make his objection known to the court during trial, not as an afterthought. If he properly objects, the court must allow him to testify.
460 So.2d at 539.
After careful consideration, we believe the better approach is that taken by the Wisconsin Supreme Court in Albright, the second district in Cutter and the majority of other courts to have addressed the issue. See e.g., State v. Allie, 147 Ariz. 320, 710 P.2d 430 (1985) ("[A] sua sponte inquiring by the trial court as to whether a defendant desires to testify is neither necessary nor appropriate."); Commonwealth v. Hennessey, 23 Mass. App. 384, 502 N.E.2d 943, (Trial judge is not required to conduct colloquy with defendant to assure, on the record, that the defendant has knowingly relinquished his right to testify), review denied, 399 Mass. 1102, 504 N.E.2d 1066 (Mass. 1987); People v. Simmons, 140 Mich. App. 681, 364 N.W.2d 783 (1985) (defendant's fundamental right to testify at trial does not require on-the-record waiver of right). Although we agree that there is a constitutional right to testify under the due process clause of the United States Constitution,[1] we agree with the Wisconsin court that this right does not fall within the *411 category of fundamental rights which must be waived on the record by the defendant himself. We view this right to be more like an accused's right to represent himself. Although such a right has been expressly recognized by the United States Supreme Court in Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), this right has not been considered so fundamental as to require the same procedural safeguards employed to ensure that a waiver of the right to counsel is knowingly and intelligently made.[2]
We also find no merit to Torres-Arboledo's sixth claim that a mistrial should have been granted due to the prosecutor's "Golden Rule" argument made to the jury during the guilt phase closing arguments. We have reviewed that portion of the argument complained of and conclude that no "Golden Rule" argument was made.
We also reject the appellant's seventh claim that there is insufficient evidence to support his convictions for first-degree murder and attempted armed robbery and that the circumstantial evidence in this case was not inconsistent with every reasonable hypothesis of innocence. We have thoroughly reviewed the record and find ample evidence to support the convictions.
Torres-Arboledo next argues that because he was not brought to trial on the instant charges within 180 days after requesting final disposition of the charges, section 941.45(3)(a), Florida Statutes (1985), that his motion for discharge was improperly denied. Subsequent to the instant offense, Torres-Arboledo was convicted of first-degree murder in California and was incarcerated in California. Florida authorities obtained his transfer from California to Florida under the Interstate Agreement on Detainers (IAD) in order to try him for the murder and attempted armed robbery of Lorenzo.
Torres-Arboledo maintains that although the Florida authorities never received notice of his demand for final disposition, he substantially complied with the terms of the IAD by completing and sending a form containing written notice and request for final disposition on the pending Florida charges to the district attorney and judge in San Leandro County, California. Torres-Arboledo also takes the position that because the request for final disposition was returned to him "via the officials of the institution where he was incarcerated, the warden or his agents would have been aware of the form and thus, had a duty to forward it to the appropriate Florida officials."
The IAD provides for a prisoner in one jurisdiction to require the speedy disposition of charges pending against him in another jurisdiction when those charges provide the basis for the lodging of a detainer against him. Section 941.45(3)(a) provides in pertinent part:
(3) REQUEST FOR FINAL DISPOSITION. 
(a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within 180 days after he shall have cause to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information, or complaint.

*412 The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner.
Section 941.45(3)(b) states that the prisoner shall give or send the "written notice and request for final disposition ... to the warden, commissioner of corrections or other official having custody of him, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court... ."
Torres-Arboledo relies on State v. Roberts, 427 So.2d 787 (Fla.2d DCA 1983), which holds that substantial compliance with the requirements of section 941.45(3) is sufficient to invoke the benefits of the agreement. Torres-Arboledo urges this Court to follow the majority of jurisdictions which have addressed the issue and adopted a substantial compliance approach to the IAD. See, e.g., McBride v. United States, 393 A.2d 123 (D.C. 1978), cert. denied, 440 U.S. 927, 99 S.Ct. 1260, 59 L.Ed.2d 482 (1979); Rockmore v. State, 21 Ariz. App. 388, 519 P.2d 877 (1974); People v. Uplinger, 69 Ill.2d 181, 13 Ill.Dec. 27, 370 N.E.2d 1054 (1977); Ekis v. Darr, 217 Kan. 817, 539 P.2d 16 (1975); State v. Barnes, 273 Md. 195, 328 A.2d 737 (1974). See generally, 98 A.L.R.3d 160, 207-208 (1980), and cases cited therein.
Even if we were to agree with the Roberts court that a prisoner should not be denied the benefits of the IAD when there has been substantial compliance with the act, Torres-Arboledo fails to meet even a substantial compliance standard. This case is clearly distinguishable from Roberts. Although Roberts failed to strictly comply with the requirement of section 941.45(3)(b), he was successful in communicating his demands to the Florida authorities by personally sending the necessary information. Both the prosecutor and the appropriate court had actual notice of the information necessary to process the detainer. In the instant case, Torres-Arboledo acknowledges that the Tampa authorities were never given notice of his demand and were never sent the information necessary under the act.
As noted by the Roberts court, courts adopting a substantial compliance standard to the agreement have generally held that "`[i]f the prisoner makes a good faith effort to bring himself within the Agreement's purview, and omits nothing essential to the Agreement's operation, then his failure of strict compliance will not deprive him of its benefits.'" 427 So.2d at 790 (emphasis added) (quoting State ex rel. Saxton v. Moore, 598 S.W.2d 586, 590 (Mo. App. 1980)); See also State v. Culligan, 454 So.2d 700 (Fla. 4th DCA 1984) (substantial compliance test not met where motion by prisoner was inadequate to provide the information required by section 941.45(3)(a)(b)).
We also reject Torres-Arboledo's claim that the California warden failed to fulfill his obligation under the agreement. See, e.g., Rockmore v. State, 21 Ariz. App. 388, 519 P.2d 877 (1974) (relief should not be denied a prisoner based on custodial officials' failure to carry out their obligation under the agreement). Under section 941.45(3)(b), a custodial officer has no duty to forward a notice and request for disposition to the receiving authorities until a request is given to him by the prisoner. The custodian's duty to forward necessary information is only triggered by an affirmative act on the part of the prisoner bringing the request to the custodian's attention. Merely having the request pass through the prison's mail system is insufficient to establish a custodian's duty under section 941.45(3)(b). We conclude that there can be no substantial compliance on the part of a prisoner absent actual notice to the receiving authorities or a clear failure by the sending authorities to carry out their obligations under the agreement. See, e.g., McBride v. United States, 393 A.2d 123. Torres-Arboledo has failed to establish either.
*413 Finding no reversible error during the guilt phase of the trial, we affirm Torres-Arboledo's convictions for first-degree murder and attempted armed robbery.

PENALTY PHASE
Torres-Arboledo challenges the trial court's override of the jury's recommendation that he be sentenced to life imprisonment. In its written order imposing the death penalty the trial court found two aggravating circumstances: 1) the capital felony was committed while Torres-Arboledo was attempting to commit a robbery with a firearm, section 921.141(5)(d), Florida Statutes (1985); and 2) Torres-Arboledo was previously convicted of a violent felony, section 921.141(5)(b), Florida Statutes; the court found no mitigating circumstances. Torres-Arboledo points to several instances of alleged error occurring during the penalty phase of the trial. However, as he concedes, any error which might have occurred was clearly harmless in light of the jury's recommendation of life. It is therefore unnecessary to address the merits of these assignments of error.
Under Florida's capital sentencing scheme, a jury's recommendation of life is entitled to great weight. Therefore, an override sentence of death will not be upheld unless the facts justifying a death sentence are so clear and convincing that no reasonable person could differ as to its appropriateness. Tedder v. State, 322 So.2d 908 (Fla. 1975); Brookings v. State, 495 So.2d 135 (Fla. 1986). As recently noted in Ferry v. State, 507 So.2d 1373 (Fla. 1987), the Tedder standard has been "consistently interpreted by this Court to mean that when there is a reasonable basis in the record to support a jury's recommendation of life, an override is improper." 507 So.2d at 1376. In other words, when there are valid mitigating factors discernible from the record which reasonable people could conclude outweigh the aggravating factors proven in a given case, an override will not be upheld. See Echols v. State, 484 So.2d 568 (Fla. 1985), cert. denied, ___ U.S. ___, 107 S.Ct. 241, 93 L.Ed.2d 166 (1986).
Relying on our decision in McCampbell v. State, 421 So.2d 1072 (Fla. 1982), Torres-Arboledo argues that although the trial court expressly rejected the expert testimony of a clinical psychologist, Dr. Mussenden, that he was very intelligent and an excellent candidate for rehabilitation, his potential for rehabilitation constituted a discernible mitigating factor which served as a reasonable basis for the jury's recommendation. We do not agree. In McCampbell, positive intelligence and potential for rehabilitation along with four other mitigating factors (exemplary employment record; prior record as a model prisoner; family background; and the disposition of the codefendants' cases) served as reasonable bases for the jury's recommendation of life. Id. at 1075-76. It is apparent from the record that Torres-Arboledo's intelligence and potential for rehabilitation were the sole factors upon which the jury could have relied in making its recommendation. We do not believe that these factors, for which the sole support was the testimony of an expert witness, are of such weight that reasonable people could conclude that they outweigh the aggravating factors proven. This is particularly so in light of the previous conviction for the California homicide which was committed subsequent to the commission of the offense at hand. Since reasonable people could not differ as to whether death was appropriate in this case, the trial judge was not bound to follow the jury's recommendation of life. We therefore find the override proper in this case.

Guidelines Departure Sentence for Attempted Armed Robbery
Finally, Torres-Arboledo claims that in sentencing him to fifteen years in connection with the attempted armed robbery conviction the trial court erred in: (1) using a guidelines score sheet that improperly assessed twenty-one points for victim injury and (2) departing from the recommended guidelines sentence without filing proper written reasons for departure. Although we agree with Torres-Arboledo that twenty-one points for victim injury were improperly *414 assessed against him, we reject his contention that the trial court failed to provide adequate written reasons for departure.
Under Rule 3.701(d)(7), Florida Rules of Criminal Procedure, "[v]ictim injury shall be scored if it is an element of any offenses at conviction." Thus, since the first-degree murder conviction, a capital felony, cannot be scored as an offense at conviction, see McPhaul v. State, 496 So.2d 1009 (Fla. 2d DCA 1986), and victim injury is not an element of attempted armed robbery, see Ritts v. State, 491 So.2d 1252 (Fla. 2d DCA 1986), points for victim injury were improperly scored. However, it is clear from the record that regardless of the presumptive sentence under the guidelines, the trial court would have departed to "the maximum penalty provided by law." The following reason for departure was orally given by the trial court and at the court's direction was written by the clerk at the bottom of the score sheet under "reasons for departure":
Anyone convicted of attempted robbery with a firearm which also results in a conviction for first-degree murder deserves, warrants and mandates the maximum penalty provided by law and although the score sheet it (sic) contains death [it] does not take into consideration first-degree murder as a surrounding circumstance of the crime itself.
Torres-Arboledo's contention that this notation written by the clerk at the court's direction was not a "written reason for departure" is without merit. See State v. Jackson, 478 So.2d 1054 (Fla. 1985); Boynton v. State, 473 So.2d 703 (Fla. 4th DCA 1985), approved, 478 So.2d 351 (Fla. 1985), cert. denied, 475 U.S. 1029, 106 S.Ct. 1232, 89 L.Ed.2d 341 (1986) ("The most common practice employed among the majority of trial judges is to write the reasons for departure on the score sheet form provided by the Sentencing Guidelines Committee ... in the place marked `Reasons for departure.'"). Contra Echevarria v. State, 492 So.2d 1146 (Fla.3d DCA 1986) (notations of reasons for departure on sentencing guidelines score sheets do not suffice as a written order). Although Torres-Arboledo does not challenge the validity of the stated reason for departure, we find the fact that a defendant has been convicted of first-degree murder, a capital felony which cannot be scored as an additional offense at conviction, may serve as a clear and convincing reason for departure. See McPhaul, 496 So.2d 1009.
Accordingly, we affirm Torres-Arboledo's convictions for first-degree murder and attempted armed robbery. We also affirm the override sentence of death and the departure sentence of fifteen years in connection with the attempted armed robbery.
It is so ordered.
McDONALD, C.J., and OVERTON, EHRLICH, SHAW, GRIMES and KOGAN, JJ., concur.
BARKETT, J., concurs in part and dissents in part with an opinion.
BARKETT, Justice, concurring in part, dissenting in part.
While I agree that appellant's conviction must stand, I dissent from the majority's conclusions regarding the sentence. In light of the totality of the circumstances presented, it simply cannot be said that no reasonable jury could have recommended life. See Fead v. State, 512 So.2d 176, 178 (Fla. 1987); Ferry v. State, 507 So.2d 1373 (Fla. 1987); Tedder v. State, 322 So.2d 908 (Fla. 1975). Therefore, I cannot conclude that the jury override was proper in this instance.
NOTES
[1] See, e.g., Harris v. New York, 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so."), Faretta v. California, 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975) ("It is now accepted ... that an accused has a right to ... testify on his own behalf..."); Brooks v. Tennessee, 406 U.S. 605, 612, 92 S.Ct. 1891, 1895, 32 L.Ed.2d 358 (1972) (the right to testify is both "an important tactical decision as well as a matter of constitutional right"); Wainwright v. Sykes, 433 U.S. 72, 93 n. 1, 97 S.Ct. 2497, 2510 n. 1, 53 L.Ed.2d 594 (1977) (Burger, C.J., concurring) ("Only such basic decisions as to whether to plead guilty, waive a jury or testify in one's own behalf are ultimately for the accused to make.").
[2] Although we expressly hold that a trial court does not have an affirmative duty to make a record inquiry concerning a defendant's waiver of the right to testify, we note that it would be advisable for the trial court, immediately prior to the close of the defense's case, to make a record inquiry as to whether the defendant understands he has a right to testify and that it is his personal decision, after consultation with counsel, not to take the stand. Such an inquiry will, in many cases, avoid post-conviction claims of ineffective assistance of counsel based on allegations that counsel failed to adequately explain the right or actively refused to allow the defendant to take the stand.