562 So.2d 820 (1990)
Alphonso JORDAN, Appellant,
v.
STATE of Florida, Appellee.
No. 89-0817.
District Court of Appeal of Florida, Fourth District.
June 6, 1990.
*821 Richard L. Jorandby, Public Defender, and Louis G. Carres, Asst. Public Defender, West Palm Beach, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Lynn Waxman, Asst. Atty. Gen., West Palm Beach, for appellee.
LETTS, Judge.
In this case, the trial judge did not reduce his reasons for departing from the sentencing guidelines to writing until after the sentencing hearing. We agree that under Ree v. State, 14 F.L.W. 565 (Fla. Nov. 16, 1989),[1] this would normally require reversal. However, in the case at bar, written reasons were articulated on the scoresheet and we hold that is sufficient to satisfy Ree. See Mauney v. State, 553 So.2d 707 (Fla. 4th DCA 1989). Accordingly, we affirm.
The public defender additionally points out that the trial judge did not personally sign the scoresheet, but we do not believe his actual signature is required.
The reasons for departure as noted on the scoresheet during the sentencing hearing read: "recent release; continuing and persistent pattern of criminal activity." This written notation is consistent with the trial judge's oral pronouncement at the hearing. We can find no requirement that the trial judge must personally sign the scoresheet. Indeed, to the contrary, our supreme court has upheld a notation on the scoresheet written by the clerk at the trial court's direction. See Torres-Arboledo v. State, 524 So.2d 403 (Fla.), cert. denied, ___ U.S. ___, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988).
The public defender further claims that the defendant's most recent acts of criminality occurred some six months before the crime now before us, and that six months is too long a time between crimes. We do not agree. The supreme court has not set an arbitrary number of days or months which would demonstrate, or not demonstrate, a continuing and persistent pattern of criminal activity. In fact, our supreme court in State v. Simpson, 554 So.2d 506 (Fla. 1989), while discussing another case, spoke of a defendant's release from prison "only months before."[2] From this, we conclude that "only months before" could certainly be interpreted to mean any period of less than a year. Moreover, ten months was held not to be too long in Williams v. State, 504 So.2d 392 (Fla. 1987).
We find no merit to any other point on appeal.
AFFIRMED.
GUNTHER, J., concurs.
GLICKSTEIN, J., concurs specially with opinion.
GLICKSTEIN, Judge, concurring specially.
Because of my belief in the necessity for sentencing guidelines and my concern for the disparity in sentencing which non-reviewable extent of departure sentences may be creating, I write, first, to express my concern for the thirty-year sentence in this case.
Appellant charges the trial court with vindictiveness against the defendant for having gone to trial, but the record does not support the charge. What may be supportable, had a "Brandeis brief" been filed with empirical, substantiating information, is that the sentence is disproportionate to the crime, or that there has been denial of equal protection of the law because of the disparity in departure sentences in similar crimes or that the sentence constitutes cruel and inhuman punishment  none of which was attempted.
As for the question of whether the sentence is disproportionate to the crime, in Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), Justice Powell *822 wrote for the majority, with Chief Justice Burger dissenting (in which dissent Justices White, Rehnquist and O'Connor joined) as follows:
The final clause [of the Eighth Amendment] prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed.
...
The principle that a punishment should be proportionate to the crime is deeply rooted and frequently repeated in common-law jurisprudence.
463 U.S. at 284, 103 S.Ct. at 3006.
[W]e hold as a matter of principle that a criminal sentence must be proportionate to the crime for which the defendant has been convicted. Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals. But no penalty is per se constitutional.
463 U.S. at 290, 103 S.Ct. at 3009-10 (footnote omitted).
[A] court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.
463 S.Ct. at 292, 103 S.Ct. at 3011.
I have no authority which speaks to the question of denial of equal protection occasioned by the disparity in departure sentences in similar cases; however, attack is possible upon the extent of departure based upon cruel and inhuman punishment, as has been suggested in Appealing the New Federal Guidelines Sentences, The Florida Bar Journal (December 1989), p. 67.
As Lisa Berlow-Lehner's article notes:
Although this area is one best left to the sound judicial discretion of the sentencing judge, that discretion is not boundless. If limits are not placed upon the sentencing court's ability to depart, the three goals of guidelines sentencing  certainty, uniformity, and proportionality  will not be achieved. Moreover, there comes a point at which the exercise of judicial discretion in departing from the guidelines can reach the realm of unusual, if not cruel, punishment. In such a case, an appellant may argue not only that the amount of departure is unreasonable, but also that it contravenes the eighth amendment. It is evident that until the guidelines are amended or precedent is established to preclude these types of appeals, challenges to the extent of the departure should be pursued.
Id. at 69 (footnote omitted).
In any event, my hands are tied in this case with respect to the extent of departure. Ms. Berlow-Lehner points out:
It is interesting to note that the experience with appeals that challenge the extent of the departure at the state level caused the Florida Legislature to remove this entire area from the ambit of appellate review. In 1987, after four years of guidelines sentencing, the Florida Legislature enacted an amendment that expressly precludes appellate review of the extent of departure. In Minnesota, on the other hand, the state supreme court set a cap on departure sentences of twice that of the guidelines sentence.
Id. at 69 (footnotes omitted).
The frustration of having my hands tied with respect to the extent of departure is not eased by the language in PRISON UTILIZATION STUDY: Risk Assessment Techniques and Florida's Inmates, produced by four Florida universities, April, 1990, the Introduction of which states:
Florida's criminal justice system is in crisis. The factors that have contributed to this crisis include: 1) the explosion of drug-related crimes, 2) the intensified efforts of law enforcement and prosecutors, 3) the public's growing demands for protection from offenders, 4) the legislative response in the form of permitting more flexibility for judges in the state's sentencing guidelines[1] and more severe *823 penalties for habitual and violent offenders, and 5) the increasing punitiveness of judges' sentencing practices. These factors combined have overwhelmed the capacities of the system.
[1] In 1988 the legislature adopted amendments to the Florida sentencing guidelines that permit judges to "bump up" or "bump down" one cell or level of penalties without that action being subject to appeal as a departure from guidelines. The effect of this is to remove the "in/out" line from the guidelines, or, in other words, to make every convicted felon subject to a possible prison sentence. During 1989 judges assigned prison terms to 8.5 percent of those whose scores placed them in the first cell; the cell labeled "nonstate prison sanction," and originally intended to keep those scoring in that cell from prison. Felons whose scores fell in the first cell constituted 21.6 percent of prison admissions during the first six months of 1989. While judges used this new flexibility to mitigate most sentences falling in higher cells (i.e., shortening their prison terms), the major impact of the change was to send more felons to prison.
Id. at i.
Theoretically, the defendant will be warehoused for thirty years at a cost to the taxpayers of $28,000 per year. How long he will actually serve is unknown to me; however, in this regard see Workpapers of the Florida Consensus, Criminal Justice Estimating Conference, February 23, 1990. However long it is, we see, again, in this case a life wasted and rendered useless as an old clock in storage.
I know nothing of this defendant other than sex, male; age, 24; and race, black; at the time of sentencing. One wonders what opportunity there was, if any, for him in the formative years. PRISON UTILIZATION STUDY discusses socioeconomic and early behavior variables that predict statistically who will be early (juvenile) offenders. Some are called demographic variables, such as race, age, sex, ethnicity, and national origin, factors beyond the offender's control. Others are status variables, such as educational level, skills, experience, residential stability, and income. Behavioral variables, such as dropping out of school, using drugs and/or alcohol and, of course, offending, also predict and can be measured by arrests, convictions or events of institutionalization.
According to PRISON UTILIZATION STUDY, a number of studies have identified child rearing methods as predictors. Others have established connections between offending by parents and/or siblings and the offending of subjects. Social deprivation, especially low incomes, has been associated with offending by several studies. One study found that, while twenty-eight percent of nonchronic offenders came from low income families, sixty-five percent of the chronic offenders did. Bonding with delinquent peers was an important variable in one study. Low intelligence and/or school failure was also a predictor.
Many have remarked on how well lack of education predicts offending. For example, retired Circuit Judge Frank A. Orlando, whose creativity sparked child rehabilitative and alternative dispute programs and who now directs the Youth Policy Center at Florida Atlantic University, writes in The Miami Herald's Viewpoints page:
There is a proved correlation between the level of education provided by a state and its prison population. Florida ranks 50th among states in the percentage of students who graduate from high school. We rank first in prison population per capita. Minnesota ranks first in high-school graduation and 49th in per capita prison population.
... .
The National Council on Crime and Delinquency recently projected that Florida's prison population will go over 100,000 by 1994 and that we are growing faster than any other state. The growth is being fueled primarily by offenders sentenced by drug-related crimes. Are we winning the "war" against drugs in Florida? No! Does the get-tough policy work? No! Does any single approach work? No!
... .
A black 16-year-old dropout with little employment opportunity does not concern himself with consequences. He is concerned with the opportunity to earn money to have some of the things most children desire. Some even need the money for the survival of their families. *824 When we develop ways to keep this child in school, give him realistic career opportunities and a feeling of self worth, we may make progress. Sending him and thousands like him through our ineffective correctional system only assures that he will become a career criminal and a sure public-safety threat.
... .
Honest and comprehensive education that informs about the effects of all drugs will assure that young people make more-informed decisions. The vast majority of children will make the right decision when they have honest information and guidance. The amount of money that we spend on effective drug education and treatment is hardly visible compared to what we spend on prisons, Stealth bombers, and the bail-out of a corrupt savings-and-loan system.
When we begin to deal with the funding issues and confront the real problems of America's growing underclass, we will begin to win the war against drug and alcohol abuse.
Amen! Id. at 11A, May 1, 1990. Society wrote off Mr. Jordan long before he was twenty-four. Someday, hopefully, a different society will put on page one the creative stories of treatment and prevention; and relegate to the back pages what, perhaps, will be the remnant acts of today's Dead End Society. Until that time, we judges and law enforcement officers will continue our Alice in Wonderland acts of putting the defendants in their warehouses with bars  or as noted in the Children's Defense Fund publication, A Call for Action to Make Our Nation Safe for Children: A Briefing Book on the Status of American Children in 1988:

A continuum of investment in prenatal care, preventive health care through
age 18, Head Start, Chapter 1 Compensatory Education, summer jobs for the
high school years, and four years of a public college paid at public
expense adds up to less than $39,000 for a child. That equals what 17
months of prison costs per inmate  the average time served for a
first conviction is 15.9 months. A year in prison costs $28,000.
 Years of
Program Annual Cost Investment Total Cost
Medicaid $ 500 X 18 $ 9,000
Head Start $2,500 X 3 $ 7,500
Chapter I $ 600 X 12 $ 7,200
Summer jobs $ 800 X 4 $ 3,200
Public College $3,000 X 4 $12,000
 _______
Total $38,900

Id. at vi.
As Ellen Goodman said on the same Viewpoint Page as Judge Orlando:
The truth is that we already know a good deal about what works. We know that Head Start works. We know that prenatal care works. We know that health care and affordable housing and good child care work. We may not know how to make every parent a strong and caring one, how to help every child have a solid sense of self, but we know more than enough to get started, to make a difference.
So it's not the facts that we lack, or the know-how. It's the energy to act. The fuel that comes from both a sense of outrage and a belief in change. That's not the stuff that comes out of glossy reports. It's made of grit.
Head Start is now being celebrated by many of us as a most worthwhile program in its twenty-fifth year. Those disadvantaged preschoolers learn "self-esteem, social *825 skills and how to get along in school" as has been said. I cannot help but wonder if the defendant here had no start as a preschool child, and suggest his twenty-fifth birthday, perhaps, should be noted by us all as a sign post of how far we have to go.
Richard Sid Powers, author of Secrecy and Power: The Life of J. Edgar Hoover, said it eloquently in his recent review of two newly published books  The Justice Juggernaut and The Police Mystique. He observed:
"It is better to know nothing," the 19th-century humorist Josh Billings used to claim, "than to know what ain't so." Here are two experts on law enforcement who say politicians and the news media are feeding us illusions about crime that not only ain't so but are tearing the country apart. These two fine studies of the crime problem argue that what we think we know about crime is wrong, that the law-and-order approach to crime control is not working and that today's war on crime will produce higher crime rates tomorrow along with ever more intrusive legal scrutiny of our daily lives.
... .
The ritual of crime and punishment  in newspaper headlines and on television screens  has become America's great reality-avoidance mechanism, its all-sufficient substitute for knowledge and thought: let a scapegoat be found, let a culprit be punished, and the public relaxes, confident that the crisis has been surmounted. These two well-informed and intelligent books argue that while newspapers and television bemuse us with police chases and courtroom dramas, the real conditions that make our society unlivable are surging to explosive force beneath our very feet.
The New York Times Book Review, May 6, 1990, p. 7.
Society must find a better way to stem the rising crime rate through positive approaches to the socio-economic deprivation of many of our youth. Until then we must at least attempt to ensure that non-reviewable extent of departure sentences do not result in the warehousing of people such as the defendant for excessive amounts of time.
NOTES
[1] This case is currently on rehearing in the Supreme Court.
[2] As to the distinction between continuing and persistent criminal activity vis-a-vis recent release from prison, see Judge Schwartz' comment in footnote 1 of Frederick v. State, 556 So.2d 471, 473 (Fla. 1st DCA 1990).