602 So.2d 1240 (1992)
Ricky Steve CORBETT, Appellant,
v.
STATE of Florida, Appellee.
No. 76072.
Supreme Court of Florida.
June 11, 1992.
Rehearing Denied September 1, 1992.
Nancy A. Daniels, Public Defender and W.C. McLain, Asst. Public Defender, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen. and Giselle D. Lylen, Asst. Atty. Gen., Miami, for appellee.
PER CURIAM.
Ricky Steve Corbett appeals his convictions for first-degree murder, kidnapping, armed robbery, and use of a firearm during the commission of a felony, and his resulting sentences, including the death sentence. We have jurisdiction.[1] For the reasons expressed, we affirm Corbett's convictions but find that we must vacate the *1241 death sentence and remand for a new penalty phase proceeding. We affirm the sentences for the other convictions.
Corbett and his codefendant, Donnie Phillips, were charged with robbery of a liquor store and the kidnapping and murder of the store clerk, Sherry Lynn Dailey. Phillips was convicted in a separate proceeding and received a life sentence for the murder of the clerk.
The facts, as established by the record, reflect that on May 5, 1989, Dailey disappeared from the King Bee Liquor Store in Freeport, Florida. Shortly after 10:30 a.m., a customer entered the liquor store and found the store abandoned and the cash register open. The store manager was called and it was determined that exactly $112 was missing from the store register. The register showed that the last sale, for $1.20's worth of merchandise, took place between 10:22 and 10:32 that morning. Furthermore, Dailey's purse was found in the store. Several witnesses stated that they saw a brown car in the vicinity of the liquor store on the morning of May 5. One witness stated that she saw a brown car in which were two black males and one white female. This witness positively identified the woman as Sherry Dailey.
Joyce Anderson owned the brown car that was identified by several of the witnesses as the car they saw in the vicinity of the liquor store. Anderson's testimony established that, on May 5, Anderson loaned the car to Corbett, who left Anderson's home in the car at approximately 6:00 a.m. Several other witnesses testified that they saw Corbett in the brown car with Donnie Phillips at various times on the morning of May 5. Donnie Phillips' brother testified that he saw a .38 caliber firearm and ammunition at his and his brother's house on May 4, 1989, while Donnie Phillips was there.
On May 8, Corbett agreed to give Tommy Watson and Terry Poston a ride to Freeport in Anderson's car. According to Watson, Corbett stopped the car and walked with Poston into the woods. Poston confirmed this testimony and stated that the two walked to an area where Corbett showed him the body of a woman. Poston testified that, upon showing him the body of the woman, Corbett stated, "That's what I think about life." Furthermore, Corbett stated that he needed someone to talk to because he was having bad dreams. Two days later, on May 11, Poston led police to the body of Sherry Dailey. Poston stated that he told Watson about the body and that they did not go to the police because they were scared of the codefendants.
Dailey's nude and badly decomposed body was found in a swampy area. Dailey had been shot four times: once in the head, once through the roof of the mouth, and twice through her left palm. The codefendant, Phillips, directed the investigating officers to Dailey's clothes, which were hidden in a plastic jug nearby. Phillips also led police to a pair of men's tennis shoes that the record reflected were similar to a pair owned by Corbett. Dailey's right ring finger had been amputated and there was a large skinning-type wound which wound from the navel, between the legs, to the anus. The pathologist first concluded that the skinning injury could have been caused by decomposition and maggots. However, he later testified that the injury appeared as if someone had used a knife to cut the skin away. Other physical evidence included the fact that fibers found in the victim's clothing were consistent with the carpet found in the brown vehicle driven by Corbett and Phillips. Corbett's palm print was also found on the counter of the liquor store.
Jessie Wooden, Phillips' and Corbett's cellmate, testified that Corbett told him that they initially planned to rob a bank or a Junior Food Store, but settled on robbing the liquor store. Corbett told Wooden that they robbed the liquor store and kidnapped the clerk just to scare her. It was established that the State did not know about this witness until the Friday preceding the trial, which was to commence on the following Monday. Based on this evidence, Corbett was found guilty of first-degree murder, kidnapping, armed robbery, and the *1242 use of a firearm during the commission of a felony.
During the penalty phase of the trial, the State presented a certified copy of Corbett's prior conviction for armed robbery, choosing not to present any additional testimonial evidence. Corbett presented testimony of a psychologist, who stated that Corbett had an IQ of 80, which is in the dull-normal range of intelligence. The psychologist testified that Corbett read at a fifth-grade level and performed arithmetic at a seventh-grade level. The psychologist also set forth Corbett's personal history, stating that Corbett grew up in a poor family, that his mother had six children but never married, and that, after Corbett's mother died, the children were split up and went to live with various relatives. The psychologist concluded that Corbett had a mental age of about fourteen and that he was neither psychotic nor suffering from any gross mental illness.
An investigator from the Walton County Sheriff's Office testified that Corbett had assisted them in making undercover drug buys, was not paid for this work, and on several occasions had provided substantial assistance to the sheriff's office. He also testified that Phillips was approximately 6 feet 2 inches tall and weighed 250 pounds. At the conclusion of the penalty phase, the jury recommended the death penalty by a seven-to-five vote.

Guilt Phase
Corbett raises two claims in his appeal of the guilt phase of the trial. In his first claim, Corbett asserts that the trial court erred in denying his motion for continuance because the late disclosure that Wooden would be called as a witness deprived him of the opportunity to investigate potential impeachment evidence. As previously noted, Wooden testified as to incriminating statements Corbett made while in jail. The trial court conducted a proper Richardson[2] hearing and determined that the State had provided the name of the witness as soon as it was known. Defense counsel argued that more time was needed for the defense to investigate for possible impeachment information and identify other inmates present when the statements were allegedly made. After arranging for defense counsel to depose Wooden, the court denied the motion for continuance. Based on the record, we find that Corbett's defense was not prejudiced by the late notice that Wooden would be a witness. Nothing was specifically proffered in post-trial motions to indicate what additional impeachment evidence concerning the other inmates would have been presented at trial had defense counsel been given an opportunity to make this investigation. We find no showing that the trial court abused its discretion under the circumstances of this cause.
In his second claim, Corbett argues that the trial court erred in restricting the cross-examination of a State witness by not permitting inquiry into the witness's pending criminal charges. While questioning Terry Poston, defense counsel asked the following questions:
Q. Mr. Poston, the reason you went to Freeport is because you thought you were going to get arrested, isn't it?
A. I guess you could say that.
Q. You knew they had warrants out for your arrest?
The prosecutor objected on the ground that defense counsel was improperly attempting to impeach the witness because the question was not limited to prior felony convictions. Corbett argues that the trial court incorrectly assumed that defense counsel was attempting a general impeachment by showing that the witness had outstanding arrest warrants or prior arrests. Corbett recognizes that general impeachment is not permitted, but argues that he was entitled to impeach the witness with pending criminal charges on the basis of our statement in Torres-Arboledo v. State, 524 So.2d 403 (Fla.), cert. denied, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988). In Torres-Arboledo we stated: "When charges are pending against a prosecution witness at the time he testifies, the defense is entitled to bring this fact to the jury's attention to *1243 show bias, motive or self-interest." Id. at 408.
In response, the State notes that the issue of pending criminal action was already before the jury for its consideration because of Poston's own testimony, in which he had stated that he had gone to Freeport because there was a warrant outstanding for his arrest. Poston also stated that he had hesitated in going to the police because the situation scared him a lot more than going to jail on his pending DUI charge. Because the issue of Poston's pending criminal charges was already before the jury, we find no reversible error. Livingston v. State, 565 So.2d 1288 (Fla. 1988); Torres-Arboledo. Accordingly, Corbett's convictions are affirmed.

Penalty Phase
The day after the jury concluded its deliberations in the penalty phase, but before the judge imposed sentence, the presiding judge was killed in a plane crash. The case was then assigned to Judge Robert Barron for sentencing. Judge Barron denied Corbett's motion for a new penalty phase proceeding and, after reviewing the record, sentenced Corbett to death. The judge found the following five aggravating circumstances: (1) the defendant was previously convicted of a felony; (2) the murder was committed to avoid arrest; (3) the murder was committed for financial gain; (4) the murder was cold, calculated, and premeditated; and (5) the murder was especially heinous, atrocious, or cruel. In mitigation, the judge found the following two factors: (1) the defendant's youthful age (twenty-one) and (2) the defendant's low intellectual level. In his sentencing order, the sentencing judge noted that the presiding judge had been killed in a plane crash and that he had been assigned to this cause for sentencing. Judge Barron expressly stated that he had "reviewed the entire record and personally examined the evidence submitted during the course of the trial and penalty phase of this case."
Corbett raises eight claims in his appeal of the penalty phase, specifically that: (1) the sentencing judge, who did not preside over the trial and penalty phases, erred in sentencing Corbett after merely reviewing the transcripts of the trial; (2) the trial judge erred in not declaring a mistrial during the penalty phase when the State, on cross-examination of the defense psychologist, elicited that Corbett had exercised his right to remain silent regarding the details of the murder; (3) the trial judge erred in not allowing the defense to present the codefendant, Donnie Phillips, merely to show his physical appearance; (4) the trial judge erred in finding, as an aggravating factor, that the murder was committed to avoid arrest and in an especially heinous, atrocious, or cruel manner; (5) the sentencing judge erred in sentencing Corbett to death, a disproportionate sentence for the offense committed; (6) the trial judge's instructions to the jury, in regard to the heinous, atrocious, or cruel aggravating circumstance, were in error; (7) the trial judge erred in reviewing a presentence investigation report that contained "victim impact" information; and (8) the trial judge erred by giving the standard penalty phase jury instruction.
We conclude that Corbett's first claim is dispositive. Rule 3.700(c), Florida Rules of Criminal Procedure, states:
(c) In those cases where it is necessary that sentence be pronounced by a judge other than the judge who presided at trial, or accepted the plea, the sentencing judge shall not pass sentence until he shall have acquainted himself with what transpired at the trial on the facts, including any plea discussions, concerning the plea and the offense.
We do not fault the circuit court for applying rule 3.700(c). While it clearly appears that rule 3.700(c) covers this situation, we now recognize that, in adopting this rule, we did not take into account death penalty cases and the very special and unique factfinding responsibilities of the sentencing judge in death cases. The trial judge has the single most important responsibility in the death penalty process. Under this process, a trial judge may not impose the death penalty unless he or she articulates in writing his or her factual findings and reasons for imposing the death penalty. *1244 We have recognized the unique responsibilities of the sentencing judge in this regard and the necessity for independent evaluations and written factual findings concerning aggravating and mitigating circumstances in imposing the death sentence. See Campbell v. State, 571 So.2d 415 (Fla. 1990); Floyd v. State, 569 So.2d 1225 (Fla. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 2912, 115 L.Ed.2d 1075 (1991); Hall v. State, 381 So.2d 683 (Fla. 1978); Holmes v. State, 374 So.2d 944 (Fla. 1979), cert. denied, 446 U.S. 913, 100 S.Ct. 1845, 64 L.Ed.2d 267 (1980).
We find that a judge who is substituted before the initial trial on the merits is completed and who does not hear the evidence presented during the penalty phase of the trial, must conduct a new sentencing proceeding before a jury to assure that both the judge and jury hear the same evidence that will be determinative of whether a defendant lives or dies. To rule otherwise would make it difficult for a substitute judge to overrule a jury that has heard the testimony and the evidence, particularly one that has recommended the death sentence, because the judge may only rely on a cold record in making his or her evaluation. We conclude that fairness in this difficult area of death penalty proceedings dictates that the judge imposing the sentence should be the same judge who presided over the penalty phase proceeding.
While our holding makes the other issues in the penalty phase moot, we find it appropriate to comment that the appellant, given the circumstances of this case, should have been able to present the codefendant to show his physical appearance. Pennsylvania v. Muniz, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); Macias v. State, 515 So.2d 206 (Fla. 1987).
For the reasons expressed, we affirm Corbett's convictions but remand for a new sentencing proceeding before a new jury.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, BARKETT, KOGAN and HARDING, JJ., concur.
GRIMES, J., concurs in part and dissents in part with an opinion.
GRIMES, Justice, concurring in part, dissenting in part.
I concur in affirming Corbett's convictions, but I dissent from the requirement of conducting a new sentencing proceeding.
The majority properly acknowledges the judge's compliance with Florida Rule of Criminal Procedure 3.700(c). However, there is another rule even more directly applicable to the circumstances of this case. Florida Rule of Criminal Procedure 3.231, entitled "Substitution of Judge," reads as follows:
If by reason of death or disability the judge before whom a trial has commenced is unable to proceed with the trial, or posttrial proceedings, another judge, certifying that he has familiarized himself with the case, may proceed with the disposition of the case.
If the judge can properly be substituted during the middle of a trial, surely this can occur for purposes of sentencing.
Furthermore, in this case we need not be concerned with the fact that the sentencing judge did not personally hear the testimony in the penalty phase proceeding. Other than a certified copy of Corbett's prior conviction of a violent felony, the State presented no evidence in the penalty phase proceeding. Thus, four of the five aggravating circumstances were based on evidence presented at the guilt phase of the trial. While Corbett did present some penalty phase testimony, the judge gave him the benefit of the only serious mitigating circumstances asserted by finding as mitigating Corbett's "relatively young age (21)" and his "relatively low intellectual level." Therefore, there is no possibility that Corbett could have been prejudiced by the judge not having personally heard the penalty phase testimony.
NOTES
[1] Art. V, § 3(b)(1), Fla. Const.
[2] Richardson v. State, 246 So.2d 771 (Fla. 1971).