592 So.2d 723 (1992)
William Thomas CONLEY, Appellant,
v.
STATE of Florida, Appellee.
No. 90-1745.
District Court of Appeal of Florida, First District.
January 2, 1992.
*725 Barbara M. Linthicum, Public Defender, and Glen P. Gifford, Asst. Public Defender, for appellant.
Robert A. Butterworth, Atty. Gen., and Edward C. Hill, Jr., Asst. Atty. Gen., for appellee.
PER CURIAM.
Appellant, William Thomas Conley, appeals his conviction for armed burglary, armed robbery, and three counts of armed *726 sexual battery, and his sentence as a habitual felony offender. He contends the trial court erred (1) in admitting hearsay testimony of a police dispatch and of the alleged victim's statements to a police officer, (2) in admitting hearsay statements made by the alleged victim to a physician who examined her, (3) in permitting an officer to testify that appellant had given police a false name after his arrest, (4) in permitting cross-examination of a defense witness about a threat he purportedly made to the victim, and (5) in permitting prosecutorial misconduct during cross-examination of the defendant and during closing argument. Conley also claims the trial court committed sentencing errors because (1) section 775.084, Florida Statutes (1989), the habitual-felony offender statute, is unconstitutional, (2) section 775.084(4) prohibits habitual-offender sentencing for both his life felonies and his first-degree felonies punishable by life, (3) the trial judge prepared an order imposing sentence prior to the sentencing hearing, (4) the court imposed three consecutive minimum-mandatory sentences upon appellant as a habitual violent felon for offenses that occurred during a single episode, and (5) the trial court included on the guidelines scoresheet a triple assessment of victim injury points for injury to a single victim during a single criminal episode. We affirm all of Conley's convictions, affirm some sentences and reverse others, for the reasons stated below.
M.M. testified that she was introduced to appellant in July or August 1989 by a friend who invited M.M. to accompany her, Conley, and another man on a trip between Jacksonville and Daytona Beach. M.M. testified that during the trip, Conley kissed her several times but that they went no further sexually. After a night at a hotel, the group returned to Jacksonville. M.M. testified that she saw Conley several times in passing after that, but spent no time with him.
M.M. testified that on November 13, 1989, she was at 8224 Eaton Avenue in Jacksonville, working as a nurse's assistant taking care of "Grumpy," the elderly mother of a neighbor, Al Douglas. Her two-year-old son, Zachary, was with her. She said that at 2 p.m. that day, Conley knocked the door down and entered the house carrying a rifle. While pointing the gun at M.M., Conley directed her to get Grumpy out of bed and put her in a wheelchair in the living room. He then forced M.M. to go into the bedroom and have repeated anal, vaginal, and oral sex with him while he kept the gun nearby. When Zachary cried from the living room, Conley permitted her to give him a bottle, but when the child started to cry again, Conley hit him. Conley then forced M.M. to continue having sex. She said that Conley fired his gun into the ceiling "to show me he meant business."
Eventually, Conley had M.M. put her clothes back on, and he took three rings from her fingers and the checkbook from her purse. He had her accompany him to a nearby trailer, where he directed her to knock on the door and ask for Steve. A child answered the door and ran outside. Conley ordered M.M. into the trailer where he looked through several drawers. He then told her to leave, but as she went out the door, he asked her what she was doing. She said she ran down the street with Conley in pursuit until she turned into a yard with people in it.
Police arrived in response to a call at about 5:15 p.m. on November 13, 1989, reporting an armed man pursuing a woman down the street. M.M. told officer Isaac Brown her version of events. Officers apprehended Conley under a bed in a house nearby with a gun at his side. The owner of the house where Conley had been staying, testified that Conley ran inside just before police arrived and said he was in trouble. An evidence technician took a checkbook from the bedroom where Conley was found. M.M. identified the checkbook as hers and the gun as the one Conley had that day. She also identified Conley, who was sitting alone in the back of a police car, as her assailant.
After arresting Conley, police found money and three rings in his possession. M.M. identified the rings as hers at trial. A photograph depicting a damaged front door to the Douglas home was admitted in *727 evidence, without objection. Police did not find evidence that a bullet had been fired at the ceiling in the bedroom where M.M. said the rape occurred. Officer W.R. Baer testified that Conley gave a false name during an interrogation after arrest, then gave his real name. Baer also said that Conley denied committing any of the crimes against M.M., and stated that he was hunting with his friend Wayne Westberry until 6 p.m. that day.
Dr. Darryl Turner examined M.M. within hours of the alleged rape. He found a bruise on her neck but no evidence of trauma to the rectum or vagina, but testified that this was not unusual depending on the preexisting state of the patient's vaginal and anal areas. The exam revealed a small amount of yellowish fluid in her anus, but no evidence of sperm in either orifice.
Several defense witnesses testified that they had seen Conley and M.M. together as a couple as recently as two weeks before the alleged crimes. Conley testified that the two of them had had a sexual relationship until late September. He testified that on November 13, he returned from hunting at around 2 p.m., then went to Al Douglas' house, where he had once lived, to visit Al and check on Grumpy. He said M.M. invited him in, but got angry when he started kidding her about seeing two other men. Conley said that she cursed him, so he slapped her face and left. He denied raping her or having sex with her that day. Conley testified that he hid from the police because he was wanted for violation of probation, and he said the gun was already under the bed where he hid.
The jury found Conley guilty of armed burglary (Count I), three counts of armed sexual battery (Counts II, III, and IV), and armed robbery (Count V). The trial court found Conley to be a habitual violent felony offender and sentenced him to life imprisonment with a fifteen-year mandatory-minimum term on each count. The sentences for Counts I and V are consecutive to those for Counts II, III, and IV, which are concurrent with one another.

TRIAL ISSUE 1
The first witness the state called was M.M., who testified that Conley had sexually assaulted her, robbed her, and confined her against her will. She testified that when she was finally able to break away and run, Conley chased her down the street with his rifle as she shouted, "Call the police." The state's second witness, Officer Isaac Brown, testified that he received a report that someone was being chased down a street by a person with a gun, so he went to investigate. The trial court properly overruled Conley's hearsay objection. The officer's statement was not offered to prove the truth of the matter asserted, but to establish why the officer went to the scene to investigate. Johnson v. State, 456 So.2d 529, 530 (Fla. 4th DCA 1984) (content of dispatch to which investigating officer responded is not hearsay, but is instead a common-sense way to explain why officers went to the scene), review denied, 464 So.2d 555 (Fla. 1985).
We note that the prosecutor did refer to this same testimony during closing argument to corroborate M.M.'s version of events, and in this context the evidence was inadmissible hearsay. Because defendant's counsel failed to object, however, this error was not preserved for appeal. Jones v. State, 577 So.2d 606, 608 (Fla. 4th DCA 1991) (contents of BOLO was inadmissible hearsay because it was improperly used by prosecutor to establish truth of the matter asserted).
The trial court also properly overruled Conley's hearsay objection to Officer Brown's testimony regarding what M.M. told him when he arrived at the scene. Brown stated that M.M. was hysterical and crying, and said that she had just been raped by a man called "Mad Dog," gave Brown a description and told him where the man had run, and recounted details of the rape. After the police canvassed the area thirty-five minutes to an hour after he had first questioned her, Officer Brown again questioned M.M. Although she was still "screaming and crying," she was able to recount the incident in detail to Officer *728 Brown. The defense objected to this entire testimony as hearsay.
The court admitted the testimony under the "fresh complaint" exception to the hearsay rule, which has been recognized in rape cases to rebut an inference of consent which may be drawn from a victim's previous silence about a sexual assault. Custer v. State, 159 Fla. 574, 34 So.2d 100, 106 (1947); McDonald v. State, 578 So.2d 371, 373-74 (Fla. 1st DCA 1991); Monarca v. State, 412 So.2d 443, 445 (Fla. 5th DCA 1982); Lyles v. State, 412 So.2d 458, 459 (Fla.2d DCA 1982). While we acknowledge the applicability of this common-law doctrine, see McDonald, we note that M.M.'s statements did not follow a period of silence which could have raised an inference of consent.
Therefore, we hold that M.M.'s responses to the officer's questions were admissible as excited utterances under Section 90.803(2), Florida Statutes (1989). Garcia v. State, 492 So.2d 360, 365 (Fla.) (officer who responded to crime was properly permitted to testify regarding what victim told him when he asked what happened, as a contemporaneous utterance admissible under the res gestae rule), cert. denied, 479 U.S. 1022, 107 S.Ct. 680, 93 L.Ed.2d 730 (1986). During the state's proffer, the court asked Officer Brown whether he could make a distinction between what M.M. told him at the two separate contacts, and the witness replied that she gave him nearly all the information in the first contact. It was within the trial court's discretion to assess the officer's credibility, and we see no error on this point.

TRIAL ISSUE 2
Dr. Darryl Turner, a resident at the University Hospital emergency room, testified that he examined M.M. on November 13. He testified that it is necessary when he examines a sexual-assault victim to obtain a history, or a description of the events. He testified that M.M. told him,
That approximately 2:00 in the morning [sic] in the home of a patient of hers, she was allegedly raped, assaulted, which included penile, oral, penile/vaginal, and penile/anal intercourse. This was done, as she stated, at gunpoint. There was also some question of violence that had occurred at that time in terms of her being struck by her assailant.
She did not know whether her assailant had ejaculated. Turner testified that from this information, he knew he needed to conduct vaginal, anal, and oral examinations, and prepare microscopic slides to look for sperm.
Section 90.803(4), Florida Statutes (1989) permits,
Statements made for purposes of medical diagnosis or treatment by a person seeking the diagnosis or treatment ... which statements describe medical history, past or present symptoms, pain, or sensations, or the inceptions or general character of the cause or external source thereof, insofar as reasonably pertinent to diagnosis or treatment.
Statements that describe the cause of an injury are admissible if they are reasonably pertinent to diagnosis or treatment of the injury. Torres-Arboledo v. State, 524 So.2d 403, 407 (Fla.), cert. denied, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988). Appellant contends that the statement in question was not reasonably pertinent to the doctor's medical diagnosis and/or treatment of the condition presented by the victim so as to be admissible under section 90.803(4). We are not so persuaded.
The uncontradicted testimony of the doctor below was that in examining an alleged victim of sexual assault he found it "necessary" to question the patient regarding the occurrence "so I can know exactly where to concentrate efforts in terms of any additional examination ..." He testified further, again without objection or contradiction, that, in addition to examining M.M.'s internal and external genitalia, he performed an overall examination which goes "to the overall condition of the patient." He described M.M. as "upset" and "emotionally labile" at the time of her visit and expressed an opinion that her emotional state at the time precluded in-depth questioning concerning the incident.
*729 With regard to statements offered under the medical diagnosis/treatment exception to Florida's hearsay rule, we have held that what is reasonably pertinent to medical diagnosis or treatment is to be determined from the perspective of the healthcare provider to whom the statement is made rather than the vantage point of an appellate court. Danzy v. State, 553 So.2d 380 (Fla. 1st DCA 1989). The Danzy court addressed the issue of admissibility of evidence offered to describe cause or inception of injury in terms of its reasonable pertinence to diagnosis or treatment of the declarant's "general condition." As in Danzy, it is clear that the doctor in the instant case was concerned about the general condition of his patient. Likewise, as in Danzy, the appellant at bar invites us to decide what the doctor needed to know or whether he needed to know information he testified was necessary in dealing with the general condition presented by his patient. We declined the invitation in Danzy and do so here.
Lastly, in Flanagan v. State, 586 So.2d 1085 (Fla. 1st DCA 1991), we recently noted that the standard of appellate review of a trial court's admission of such evidence is whether the trial court abused its discretion in admitting the evidence. Below, the trial court evaluated the statement offered and found it to be reasonably pertinent to diagnosis and treatment. Appellant does not argue here that the trial court abused its discretion in finding that the evidence in question was reasonably pertinent to diagnosis and treatment. Rather, he only argues in general and conclusory fashion that such evidence was erroneously admitted. Our review of the record fails to disclose any abuse of discretion in admitting M.M.'s statement to her examining doctor.
Even if error had been shown in this regard, on this record we would hold such error to be harmless. The testimony in question was cumulative to statements of Officer Brown recounting M.M.'s account of what transpired and does not appear to have added any additional insight into M.M.'s testimony. See also Flanagan v. State.

TRIAL ISSUE 3
Officer Baer testified that after the police arrested Conley, he told them his name was Ronald Jones. The officers determined it was a false name and told that to Conley, who then gave his correct name. The defense objected to this testimony, asserting that it was irrelevant to the charges and unduly prejudicial, but was correctly overruled. When the defendant uses an alias to avoid arrest or prosecution, testimony regarding the alias is admissible as evidence of a consciousness of guilt of the instant offense. Weston v. State, 452 So.2d 95, 95 (Fla. 1st DCA), review denied, 456 So.2d 1182 (Fla. 1984).

TRIAL ISSUE 4
During the defendant's case, the prosecutor queried defense witness Russell Riggs about a confrontation outside the courtroom between Riggs and M.M. After the court overruled Conley's objection, the prosecutor asked Riggs whether he had said, "There's the bitch," "You ain't worth fucking," and "You are going to pay, bitch." Conley claims the court should not have permitted such questioning. He relies on cases in which courts have held that evidence of threats made against a witness to induce that witness not to testify are inadmissible to prove a defendant's guilt unless it is shown that the defendant authorized the threat. Duke v. State, 106 Fla. 205, 142 So.2d 886 (1932); Jones v. State, 385 So.2d 1042 (Fla. 1st DCA 1980); Reeves v. State, 423 So.2d 1017 (Fla. 4th DCA 1982).
However, Riggs' alleged remarks to M.M. were not introduced for the purpose of showing that Riggs tried to prevent her from testifying, but to show Riggs' bias, and in this context they were admissible. Koon v. State, 513 So.2d 1253, 1256 (Fla. 1987) (trial court properly permitted the state to question a defense witness about "an unflattering name" he had allegedly called a federal prosecutor), cert. denied, 485 U.S. 943, 108 S.Ct. 1124, 99 L.Ed.2d 284 (1988); Chandler v. State, 366 So.2d 64, 71 (Fla. 3d DCA 1978) (defendants were properly *730 permitted to develop theory that witness for the state was prejudiced against co-defendants because the latter had once made a complaint about the witness to their common employer), cert. denied, 376 So.2d 1157 (Fla. 1979), aff'd, 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981).

TRIAL ISSUE 5
Conley contends that the prosecutor made four statements that were improper and together constitute reversible error. First, during Conley's cross-examination, Conley confirmed that he denied having sex with M.M. on November 13. The prosecutor then asked whether the reason, then, that the defense presented other witnesses who testified that Conley and M.M. were in a romantic relationship was an attempt to "show her as a slut." The court sustained an objection to this question. The prosecutor continued by asking whether Conley was trying to prove through these witnesses that he and M.M. were in a relationship, and that he was therefore able to have sex with her whenever he wanted. Conley claims that this constituted an improper and prejudicial comment on his attorney's presentation of Conley's defense, relying on Eberhardt v. State, 550 So.2d 102 (Fla. 1st DCA 1989), review denied, 560 So.2d 234 (Fla. 1990), and Rosso v. State, 505 So.2d 611 (Fla. 3d DCA 1987). However, in each of those cases, the prosecutor's comment on the defendant's defense was found to be improper because it amounted to a comment on the defendant's failure to take the stand.
Even if it is error to comment disparagingly on a person's defense, it appears from reading further in the record that the prosecutor was not doing this. The evidence established that when Conley went to Al Douglas' house on November 13, he kicked the door in. By questioning Conley as described above, the prosecutor was setting a foundation to ask Conley why, if he and M.M. were on a friendly basis and had an ongoing sexual relationship, Conley would have needed to kick in the door. This was entirely proper.
Second, the prosecutor referred in closing argument to the hostile remarks Riggs allegedly made to M.M. outside the courtroom. Conley claims the prosecutor mischaracterized such evidence by asserting that Riggs had testified that he intentionally spoke loudly to his friends so that M.M. could hear him, when in fact, Riggs had testified that he had not made the disparaging remarks loudly. After the defense objected, the court instructed the jury that "what the lawyers say is not evidence." The prosecutor's mischaracterization of Riggs' testimony was essentially insignificant and certainly did not amount to reversible error. Conley also claims that the prosecutor insinuated that he personally witnessed the hallway encounter, but there is no such insinuation in the record.
Third, in closing argument the prosecutor said,
You know what you have seen and what you have heard is exactly why they tell us a lot of people don't report rape. You know why? Because they are going to have to tell their entire details of a very disgusting, terrible, degrading demoralizing event to two, three, five, ten people, tell it to a jury, tell it to the police officers, tell it to defense attorneys, and then sit idly by as he parades witness after witness to say what a terrible person she is.
Conley claims that this inflammatory statement improperly accused the defendant and/or defense counsel of further victimizing M.M. by exercising his right to a trial. Jenkins v. State, 563 So.2d 791 (Fla. 1st DCA 1990). The state contends that the prosecutor had a right to comment on Conley's "improper character assassination" of M.M. through several defense witnesses,[1] *731 because Conley's counsel implied in opening statement that he would rely on the defense of consent, but when Conley took the stand, he testified that he had not had sex with M.M. that day. However, the defense was entitled to present evidence of a prior sexual relationship between M.M. and Conley as a means of attacking M.M.'s credibility, because she had asserted that she had only met Conley once. We conclude that the prosecutor's remark was improper but in the context of this case was harmless error.
Finally, later in closing argument, the prosecutor stated, "[Defense counsel said `I d]on't like my client.['] I don't like him either. I don't like people who rape, rob, burglarize." (These were precisely the charges against Conley.) Such remarks regarding a prosecutor's personal beliefs about the guilt or innocence, or the credibility of an accused are clearly improper. Reed v. State, 333 So.2d 524 (Fla. 1st DCA 1976); Singletary v. State, 483 So.2d 8 (Fla. 2d DCA 1985); Blackburn v. State, 447 So.2d 424 (Fla. 5th DCA 1984). However, again under the circumstances of this case was harmless error.

SENTENCING ISSUE 1
Conley claims the habitual offender statute, Section 775.084, Florida Statutes (1989), is unconstitutional because it is arbitrarily left up to a prosecutor or a judge to decide whether a defendant will be sentenced under the statute, when another defendant charged with identical offenses may not be. This argument was rejected in Barber v. State, 564 So.2d 1169 (Fla. 1st DCA), review denied, 576 So.2d 284 (Fla. 1990), regarding the 1987 statute. He also claims the statute violates the prohibition against ex post facto laws because a defendant can be sentenced as a violent felony offender when the instant offense is non-violent but a prior offense was violent; therefore, the focus of the statute is on the prior violent felony. In the case at bar, Conley's sole prior violent felony was a 1985 robbery conviction, which occurred before the amended habitual offender statute was enacted. He claims that this constitutes an impermissible ex post facto application of section 775.084.
We disagree. The supreme court rejected this kind of ex-post-facto argument in Cross v. State, 96 Fla. 768, 119 So. 380 (Fla. 1928). "The statute is not rendered ex post facto by providing enhanced punishments for a subsequent offense because of convictions occurring prior to the passage of the statute." Id. 119 So. at 385.
Conley also claims that the focus on the prior violent offense renders the enhancement for the instant offense a second punishment, which violates the prohibition against double jeopardy. The court also rejected this argument in Cross, when it concluded that the consideration of prior offenses in determining whether a defendant is a habitual offender does not constitute a second punishment for the former offenses, but is instead a "more severe punishment for the last offense." Id. Accord Washington v. Mayo, 91 So.2d 621, 623 (Fla. 1956).

SENTENCING ISSUE 2
Conley was convicted of armed burglary of a dwelling (Count I) and armed robbery (Count V), both first-degree felonies punishable by life, and armed sexual battery (Counts II, III, and IV), a life felony. Citing Barber v. State, he claims the penalties for life felonies and first-degree felonies punishable by life may not be enhanced under the habitual-offender statute. *732 This court recently held in Johnson v. State, 568 So.2d 519 (Fla. 1st DCA 1990), and Gholston v. State, 589 So.2d 307 (Fla. 1st DCA 1990), that the habitual-offender statute cannot be applied to defendant's convictions classified as life felonies. However, we held in Burdick v. State, 584 So.2d 1035 (Fla. 1st DCA 1991), petition for review filed, No. 78,466 (Fla. Aug. 20, 1991) (oral announcement held Dec. 6, 1991), that sentences for first-degree felonies punishable by life may be enhanced under section 775.084. Therefore, we affirm the life sentences for Counts I and V, reverse the life sentences for the life felonies in Counts II, III, and IV, and remand for resentencing.

SENTENCING ISSUE 3
Conley claims the trial judge committed reversible error by preparing a written sentencing order prior to the sentencing hearing, relying on Ree v. State, 565 So.2d 1329 (Fla. 1990), in which the supreme court held that a trial court must prepare a written order containing reasons for departure from the sentencing guidelines at the time of sentencing. However, because Ree applies only to sentences imposed after Ree was decided on July 19, 1990, State v. Lyles, 576 So.2d 706 (Fla. 1991), and Conley was sentenced on May 23, 1990, Ree does not pertain to the case at bar.

SENTENCING ISSUE 4
Conley was sentenced as a habitual violent felony offender to three consecutive life sentences, including three consecutive fifteen-year minimum mandatory terms. The sentences for armed sexual battery are to run concurrently with each other and consecutively to the sentence imposed for armed robbery and armed burglary, which also run consecutive to each other. Conley claims that the court erred in making the overall sentences and the minimum mandatories consecutive when the crimes occurred "during a single episode." State v. Boatwright, 559 So.2d 210 (Fla. 1990); Palmer v. State, 438 So.2d 1 (Fla. 1983). Because we reverse Conley's life sentences under the habitual-offender statute for the three counts of sexual battery, and because we conclude that the armed burglary and armed robbery did not constitute a single criminal episode, we affirm the consecutive sentences.
This case is comparable to Murray v. State, 491 So.2d 1120 (Fla. 1986). In Murray, the victim was abducted by two men, who forced the victim to drive away with them in her car. The defendants stole money from the victim's purse while driving, parked the car and sexually assaulted her, took her necklace, then left the victim and took her car. The court held that the robbery of the money and the car took place at different locations from the sexual batteries, justifying imposition of separate minimum-mandatory sentences under section 775.087(2). In the case at bar, Conley committed the armed burglary when he broke into the Douglas home where M.M. was working on November 13, and he committed the armed robbery several hours later after he perpetrated the sexual batteries. We consider the burglary and robbery to constitute two separate acts warranting consecutive minimum-mandatory sentences.

SENTENCING ISSUE 5
A guidelines scoresheet was prepared for Conley which reflects 120 points for victim injury.[2] The trial court presumably derived this amount by assessing 40 points for "penetration or slight injury" for each of the three counts of sexual battery. Pursuant to Florida Rule of Criminal Procedure 3.701(d)(7), however, victim injury should be scored according to the number of victims in a criminal episode rather than the number of counts. Williams v. State, 565 So.2d 838 (Fla. 1st DCA 1990), review denied, 576 So.2d 295 (Fla. 1991). Therefore, the triple assessment against Conley was erroneous.

CONCLUSION
In summary, appellant's convictions for armed burglary, armed robbery, and three counts of armed sexual battery are all affirmed; *733 the life sentences for Counts I and V are affirmed; however, the life sentences for the life felonies in Counts II, III and IV are reversed and the case is remanded for resentencing as to Counts II, III and IV.
JOANOS, C.J., and MINER, J., concur.
ERVIN, J., dissents with written opinion.
ERVIN, Judge, dissenting.
In my judgment there were three errors committed during trial that warrant granting appellant a new trial: admission of certain portions of the physician's testimony regarding statements M.M. made to him; admission of Officer Baer's testimony that Conley provided an alias when first arrested; and failure to instruct the jury to disregard certain of the prosecutor's inflammatory remarks. Although I do not believe that any of the above errors standing alone would necessarily be reversible, I consider that in combination they had the effect of denying Conley a fair trial.
Dr. Turner testified that M.M. had told him that she was raped, and that "[t]his was done, as she said, at gunpoint." I do not consider that this statement falls within the hearsay exception for statements dealing with medical diagnosis or treatment. § 90.803(4), Fla. Stat. (1989). That her assailant, whom she had already testified was appellant, may have held her at gunpoint as he assaulted her, had no relevant value regarding whatever medical treatment she may have required. Torres-Arboledo v. State, 524 So.2d 403 (Fla.), cert. denied, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988) (victim's statement to physician that black men had tried to steal his medallion was not reasonably pertinent to medical treatment, thus was inadmissible hearsay). The court should therefore have directed the jury to disregard the hearsay statement quoted above. See also Flanagan v. State, 586 So.2d 1085, 1102 (Fla. 1st DCA 1991) (Ervin, J., concurring and dissenting) (statements of fault not related to diagnosis and treatment are inadmissible under section 90.803(4)).
Next, I agree with appellant that Officer Baer's testimony that Conley gave a false name to the arresting officers was both irrelevant and unduly prejudicial. I do not dispute that when a defendant uses an alias to avoid arrest or prosecution, testimony regarding the alias is admissible as evidence of a consciousness of guilt of the offense. Weston v. State, 452 So.2d 95, 95 (Fla. 1st DCA), review denied, 456 So.2d 1182 (Fla. 1984); Finlay v. State, 424 So.2d 967, 969 (Fla. 3d DCA 1983). This was not the situation at bar, however. Because Conley was already under arrest when he gave the false name, it is apparent that he was not using the alias to avoid arrest or prosecution for the instant offenses, but may have been using the alias to avoid prosecution for a prior, unrelated offense. Conley testified that he was wanted at the time of his arrest for violation of probation, which would constitute motivation for giving a false name. In such situation, the testimony is inadmissible. Redford v. State, 477 So.2d 64, 65 (Fla. 3d DCA 1985); Finlay, 424 So.2d at 969.
Finally, I agree with the majority that the third and fourth instances of alleged prosecutorial misconduct were clearly improper, but when considered in combination with the errors discussed above, I do not find these to have been harmless. State v. DeGuilio, 491 So.2d 1129 (Fla. 1986).
I otherwise concur with the majority on the remaining points raised regarding errors during the trial. Because I would reverse and remand for new trial based upon the cumulative effect of the errors discussed above, I would not reach the sentencing errors appellant raised.
NOTES
[1] The state is referring to the testimony of Wayne Westberry, Russell Riggs, and Manson McClain, each of whom testified that he was a close friend of Conley's, and that he had been with Conley and M.M. together and observed they were in some kind of romantic relationship. Westberry also testified that he walked in on the two of them naked in the bedroom; and Riggs testified that M.M. took her shirt off in Riggs' car while Conley was there. The state did not object to either remark. However, just prior to the defense's case, the state asked for a proffer of Westberry's testimony, and defense counsel represented that Westberry saw Conley and M.M. naked in bed together, and the court stated that such testimony was proper and relevant "based upon what your opening argument was." In opening argument, defense counsel had stated that the evidence was going to establish that M.M. had a sexual relationship with Conley, and that several of the witnesses would testify that they had repeatedly seen the couple kissing and holding hands, or naked together in bed, and that M.M. had removed her shirt in front of Conley and another man, to which counsel commented, "so I think you will get a flavor of the type of relationship that is going on." It appears from the record that both the court and the prosecutor believed from this argument that Conley was going to put on a defense of consent.
[2] Because we reverse Conley's sentences under the habitual-offender statute for his life felonies of Counts II, III, and IV, this scoresheet will be applicable to Conley on remand.