936 So.2d 619 (2006)
Wyon Dale CHILDERS, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. 1D03-2154.
District Court of Appeal of Florida, First District.
June 28, 2006.
Richard G. Lubin and Tama Beth Kudman, of Richard G. Lubin, P.A., West Palm Beach, Nathan Z. Dershowitz of Dershowitz, Eiger & Adelson, P.C., New York, NY, for Appellant/Cross-Appellee.
Charlie J. Crist, Jr. Attorney General, and Trisha Meggs Pate, Assistant Attorney General, Tallahassee, for Appellee/Cross-Appellant.
EN BANC

ON APPELLANT'S MOTION FOR CERTIFICATION
PER CURIAM.
We deny appellant's motion for certification, bringing proceedings in this case to a *620 close in this court. In doing so, we note that the three-judge panel to which this case was originally assigned reached a decision which resulted in an opinion circulated on prerelease with a proposed release date of June 22, 2005.
Before the panel decision was released, a vote of the court was taken, and a majority of the judges participating ordered that the case be determined en banc, in keeping with Florida Rule of Appellate Procedure 9.331(a). Judge Barfield is recused. He did not participate on this procedural question, and has not otherwise participated in consideration or decision of this case.
Eventually, "a majority of the active judges actually participating and voting on the case," Fla. R.App. P. 9.331(a), reached the en banc decision released by the court on February 2, 2006. While the panel had proposed to reverse appellant's conviction (2-1), the superseding decision of the en banc court was to affirm the conviction (10-4).
A dissenting judge seems to have suggested and the appellant now argues that this course of proceedings is somehow irregular. This is not correct. While en banc consideration is infrequent, when it occurs, it is much more likely to occur before, rather than after, the panel decision it replaces has been published. Compare Pullo v. Pullo, 926 So.2d 448 (Fla. 1st DCA 2006) (en banc decision released without antecedent publication of panel decision); Checkers Rest. v. Wiethoff, 925 So.2d 348 (Fla. 1st DCA 2006) (en banc decision released without antecedent publication of panel decision); Bay Point Club, Inc. v. Bay County, 890 So.2d 256 (Fla. 1st DCA 2004) (en banc decision released without antecedent publication of panel decision); Sanders v. State, 847 So.2d 504 (Fla. 1st DCA 2003) (en banc decision released without antecedent publication of panel decision); Chavarria v. Selugal Clothing, Inc., 840 So.2d 1071 (Fla. 1st DCA 2003) (en banc decision released without antecedent publication of panel decision); Jupiter v. State, 833 So.2d 169 (Fla. 1st DCA 2002) (en banc decision released without antecedent publication of panel decision); Fisher v. Int'l Longshoremen's Ass'n, 827 So.2d 1096 (Fla. 1st DCA 2002) (en banc decision released without antecedent publication of panel decision); Brooks v. State, 816 So.2d 199 (Fla. 1st DCA 2002) (en banc decision released without antecedent publication of panel decision); Orange County Fire Rescue v. Antonelli, 794 So.2d 758 (Fla. 1st DCA 2001) (en banc decision released without antecedent publication of panel decision); Jones v. State, 790 So.2d 1194 (Fla. 1st DCA 2001) (en banc decision released without antecedent publication of panel decision); Morris v. State, 789 So.2d 1032 (Fla. 1st DCA 2001) (en banc decision released without antecedent publication of panel decision); Wilcox v. State, 783 So.2d 1150 (Fla. 1st DCA 2001) (en banc decision released without antecedent publication of panel decision); Closet Maid v. Sykes, 763 So.2d 377 (Fla. 1st DCA 2000) (en banc decision released without antecedent publication of panel decision); Sailor v. State, 733 So.2d 1057 (Fla. 1st DCA 1999) (en banc decision released without antecedent publication of panel decision); Trowell v. State, 706 So.2d 332 (Fla. 1st DCA 1998) (en banc decision released by general division without antecedent publication of panel decision, then withdrawn and replaced by en banc decision of full court), approved by 739 So.2d 77 (Fla.1999); Hadden v. State, 670 So.2d 77 (Fla. 1st DCA 1996) (en banc decision released without antecedent publication of panel decision), approved in part, quashed in part by 690 So.2d 573 (Fla.1997); Champlovier v. City of Miami, 667 So.2d 315 (Fla. 1st DCA 1995) (en banc decision released without antecedent publication of panel decision); E. Airlines *621 v. Griffin, 654 So.2d 1194 (Fla. 1st DCA 1995) (en banc decision released without antecedent publication of panel decision); Publix Supermarkets v. Finocchi, 650 So.2d 1122 (Fla. 1st DCA 1995) (en banc decision released without antecedent publication of panel decision); Publix Super Markets, Inc. v. McGuire, 650 So.2d 151 (Fla. 1st DCA 1995) (en banc decision released without antecedent publication of panel decision on remand from McGuire v. Publix Super Markets, Inc., 640So.2d 1079 (Fla.1994), quashing 629 So.2d 862 (Fla. 1st DCA 1993) (en banc decision released without antecedent publication of panel decision)); Vegas v. Globe Sec., 627 So.2d 76 (Fla. 1st DCA 1993) (en banc decision released without antecedent publication of panel decision); Ullman v. City of Tampa Parks Dep't, 625 So.2d 868 (Fla. 1st DCA 1993) (en banc decision released without antecedent publication of panel decision); Saffor v. State, 625 So.2d 31 (Fla. 1st DCA 1993) (en banc decision released without antecedent publication of panel decision), quashed by 660 So.2d 668 (Fla.1995); Orange County Sch. Bd. v. Perkins, 619 So.2d 1 (Fla. 1st DCA 1993) (en banc decision released without antecedent publication of panel decision); Zundell v. Dade County Sch. Bd., 609 So.2d 1367 (Fla. 1st DCA 1992) (en banc decision released without antecedent publication of panel decision), quashed by 636 So.2d 8 (Fla.1994); Jones v. State, 606 So.2d 709 (Fla. 1st DCA 1992) (en banc decision released without antecedent publication of panel decision), quashed by 616 So.2d 52 (Fla.1993); Lee v. State, 606 So.2d 1222 (Fla. 1st DCA 1992) (en banc decision released without antecedent publication of panel decision); Terners of Miami Corp. v. Freshwater, 599 So.2d 674 (Fla. 1st DCA 1992) (en banc decision released without antecedent publication of panel decision); Flanagan v. State, 586 So.2d 1085 (Fla. 1st DCA 1991) (en banc decision released without antecedent publication of panel decision), approved in part by 625 So.2d 827 (Fla.1993); Burdick v. State, 584 So.2d 1035 (Fla. 1st DCA 1991) (en banc decision released without antecedent publication of panel decision), approved in part, quashed in part by 594 So.2d 267 (Fla.1992); with Bush v. Holmes, 886 So.2d 340 (Fla. 1st DCA 2004) (en banc decision on rehearing released after publication and withdrawal of panel decision), aff'd in part by 919 So.2d 392 (Fla.2006); Vause v. Bay Med. Ctr., 687 So.2d 258 (Fla. 1st DCA 1996) (en banc decision on rehearing released after publication and withdrawal of panel decision); Slay v. Singletary, 676 So.2d 456 (Fla. 1st DCA 1996) (en banc decision released by general division after publication and withdrawal of panel decision), approved by 688 So.2d 319 (Fla.1997); Jenkins v. State, Dep't of Health & Rehab. Servs., 618 So.2d 749 (Fla. 1st DCA 1993) (en banc decision on rehearing vacating and superseding published panel decision). See also S. States Utils. v. Fla. Pub. Serv. Comm'n, 714 So.2d 1046 (Fla. 1st DCA 1998) (en banc decision released by administrative division without antecedent publication of panel decision); Scantling v. State, 704 So.2d 565 (Fla. 1st DCA 1997) (en banc decision released by criminal division without antecedent publication of panel decision), approved by 711 So.2d 524 (Fla. 1998); Sheley v. Fla. Parole Comm'n, 703 So.2d 1202 (Fla. 1st DCA 1997) (en banc decision released by criminal division without antecedent publication of panel decision), approved by 720 So.2d 216 (Fla. 1998); Richardson v. State, 698 So.2d 551 (Fla. 1st DCA 1997) (en banc decision released by criminal division without antecedent publication of panel decision); J.B. v. State, 689 So.2d 360 (Fla. 1st DCA 1997) (en banc decision released by criminal division without antecedent publication of panel decision), approved by 705 So.2d 1376 (Fla.1998); Ganyard v. State, 686 So.2d *622 1361 (Fla. 1st DCA 1996) (en banc decision released by criminal division without antecedent publication of panel decision), approved by 705 So.2d 567 (Fla.1998); N. River Ins. Co. v. Wuelling, 683 So.2d 1090 (Fla. 1st DCA 1996) (en banc decision released by workers' compensation division without antecedent publication of panel decision); Singletary v. Jones, 681 So.2d 836 (Fla. 1st DCA 1996) (en banc decision released by criminal division without antecedent publication of panel decision).
The constitutional propriety and practical necessity of an en banc procedure in the district courts of appeal, conducted in conformity with rules promulgated by the Supreme Court of Florida, do not present substantial questions. See Chase Fed. Sav. & Loan Ass'n v. Schreiber, 479 So.2d 90, 93-94 (Fla.1985). These questions were not, indeed, originally raised by the parties in this case, but were interjected judicially, by a judge who had participated in every en banc determination by the full court set out above, and never in any of them expressed any reservations on the constitutionality of the process.
The motion for certification is denied. No motion for rehearing will be considered. The mandate shall issue upon release of this opinion.
ALLEN, DAVIS, BENTON, VAN NORTWICK, PADOVANO, BROWNING, LEWIS, HAWKES, and THOMAS, JJ., concur; WEBSTER, J., concurs in result only; ALLEN and PADOVANO, JJ., concur with written opinions; WOLF and POLSTON, JJ., concur in part and dissent in part with written opinions; KAHN, C.J., dissents with written opinion in which ERVIN, J., concurs.
ALLEN, J., concurring.
I concur in the court's denial of the motion for certification, and write to expand upon the observations made in my brief original concurring opinion. Readers of the original opinions in this case were likely either perplexed or amused. (I have never before seen or heard of an appellate case with ten separate opinions.) In light of statements contained in some of the opinions, readers also might have suspected that something improper was involved in this court's decision to consider this case en banc. Implying that the majority of this court knowingly acted outside the requirements of law in voting for en banc consideration of this case, Judge Kahn wrote, "Perhaps to its credit, the majority has not even attempted to set out an adequate jurisdictional statement to support en banc consideration." And Judge Wolf, joined by Judge Kahn, asserted even more pointedly that the votes in favor of en banc consideration "cannot be justified." The only substantive response to these accusations was the brief and non-specific concurring opinion that I authored. A precise explanation of my reason for voting in favor of en banc consideration of this case now appears necessary because Judge Kahn has seen fit, through his most recent dissenting opinion, to offer further entreaties to the supreme court for review of this court's decision to consider this case on an en banc basis, and because Judges Kahn and Wolf have refused to revise their opinions to delete their accusations that this court has knowingly acted in a manner contrary to the requirements of law.
This opinion is not written in an effort to dissuade the supreme court from reviewing this case. Whether the supreme court sees fit to review this case and address the issue of this court's vote in favor of en banc consideration is obviously the prerogative of that court, and I would not presume to advise the supreme court on how that prerogative should be exercised. But if this issue is to be addressed by the supreme court, I believe the supreme *623 court should be made aware of more than the accusations of Judges Kahn and Wolf and the non-specific response previously provided.
This opinion is also not written because I believe an appellate court or any appellate judge is obligated to articulate reasons for considering a case en banc. Florida Rule of Appellate Procedure 9.331 (the en banc rule) contains no such requirement, and I am aware of no decisional law indicating that this is required. For my part, I have never questioned a judge's reason for voting for en banc consideration of a case, opting instead to simply accept the vote of a fellow judge as the expression of his or her honest and thoughtful view as to the fitness of a particular case for en banc consideration. I express my reason for voting in favor of en banc consideration in this case because some members of this court do not extend the same deference to me and other members of this court, and because there is at least a possibility that the supreme court will accept review in this case and assume from the accusations of Judges Kahn and Wolf and the absence of a specifically articulated justification for en banc consideration that none exists, and most importantly, because these accusations have the potential of raising a question in the minds of members of the public as to this court's commitment to the rule of law.
I observed in my original concurring opinion that the restitution issue addressed by the court would amply satisfy the demanding standard of judges who would require an issue of exceptional importance before voting for en banc consideration of a case based upon "exceptional importance." Contrary to Judge Wolf's accusation, my original opinion contained no "implication that the restitution issue had anything to do with the vote of the court to go en banc." I do not know why each of the various judges cast their votes as they did on the en banc question. But I do know that the restitution issue had nothing to do with my own vote. Although the restitution issue does seem to me to provide an appropriate basis for en banc consideration, my favorable vote on the en banc motion was not based on the restitution issue. In fact, none of the issues involved in the case had an impact upon my vote.
As I explained in my earlier opinion, I believe there are circumstances in which considerations external to the particular issues presented in the parties briefs will cause a case to be of exceptional importance. I voted in favor of en banc consideration of this case in accordance with my belief that this case involved such circumstances. My vote in favor of en banc consideration was based upon my concern that participation by a particular judge of this court in the panel decision would have led to public perceptions of partiality by this court.
Because public perceptions are involved here, I begin by outlining some background information that has been presented to the general public through the news media. Although numerous news articles have been written regarding the relationship between Mr. Childers and Pensacola attorney Fred Levin, I quote in full only three of these articles in order to provide a flavor for what the public has been told about their relationship. These articles also reference the close personal relationship both Mr. Childers and Mr. Levin enjoyed with Governor Lawton Chiles. (Because I lack personal knowledge as to the matters discussed in the articles, I do not vouch for the accuracy of the information contained therein. Whether completely accurate or not, the significant point here is that these articles reflect what the public has been told.) The first article is from *624 the March 23, 1998, edition of the Miami Herald, the second is from the May 4, 2002, edition of the St. Petersburg Times, and the third is from the June 23, 2002, edition of the St. Petersburg Times.

Chiles Under Fire for Tobacco Deal
TALLAHASSEE(AP)Hailed as a hero last summer after winning an $11 billion settlement with the tobacco industry, Gov. Lawton Chiles is now being asked lots of questions about the deal.
Nearly every facet of the agreement is now being investigated. The Legislature wants answers, and last week, ABC's 20/20 dubbed the entire affair as "an old boys scam."
Chiles and some longtime croniesformer inspector general Harold Lewis, state Sen. W.D. Childers, R-Pensacola, and Pensacola lawyer Fred Levin slipped past lawmakers the law that made it easier for the state to sue tobacco companies. The governor and his friends then picked the so-called legal dream teamsome of the wealthiest and most established attorneys in the Southto represent the state.
"There must have been something to keep secret for it not to have been done in the open," said state Sen. Charlie Crist, who chairs the Senate Executive Business, Ethics and Elections Committee.
Chiles rejected an invitation to appear on the ABC program last week.
"The governor has talked about this and talked about this. Almost since the day of the settlement we've been talking about this," said Ryan Banfill, press secretary for Chiles. "He's talked till he's been blue in the face on this issue."
Chiles had the disputed amendments to Florida's Medicaid law, called the Third Party Liability Act, tacked onto a noncontroversial bill that easily passed in the frantic final hours of the 1994 session.
Only later did lawmakers learn that the changes made it easier to win product liability suits against the tobacco industry and possibly other businesses.
Then lawmakers were ignored when Chiles named a group of well-heeled private attorneys, giving them 25 percent in fees of any settlement.
"Why do we have an attorney general for crying out loud?" asks Crist. "We're already paying for 300, 400 lawyers working under his direction."
But Chiles chose former law school acquaintance, West Palm Beach trial lawyer Bob Montgomery, to head the legal team.
"Most everybody is excluded unless you're the buddy of the governor's," Crist said. "It's the good ol' boy network run amok."

A Career in Dark, Brought to Light
TALLAHASSEE(By Steve Bousquet)His official portrait hangs prominently in the Senate chamber with other former Senate presidents, as if he's still watching over the proceedings below.
W.D. Childers. Dubya Dee. The Banty Rooster. Dean of the Senate.
If not for term limits, he'd still be there, strutting around, cutting deals, generally playing the Capitol for laughs and thumbing his nose at convention. Instead he's home in Pensacola, freshly fingerprinted and photographed.
Childers was suspended this week from his position as the chairman of the Escambia County Commission, charged with five misdemeanor counts of violating the Sunshine Law that prohibits local government officials from discussing public business in private.

*625 Five times, the grand jury said, Childers "did unlawfully and knowingly attend a meeting not held in accordance with the provisions of Section 286.011, Florida Statutes, and at said meeting official acts were taken."
Childers may have a novel defense: his 30 years in the Legislature, where discussions are routinely made in private.
The Sunshine Law that Childers is accused of violating does not apply to the Legislature. Only certain types of legislative meetings are required to be public, and different rules apply at different times.
In the Capitol, Childers became an iconic figure, his legend growing larger with each election cycle. He was the redneck politician who chewed tobacco and used cuss words. He once taped a sign to this office door asking for campaign contributions. When he gripped the Senate gavel, the agenda moved at warp speed with no hope of meaningful discussion of public policy.
With open government seemingly under assault from all sides, here's a thought to ponder: What was so funny about W.D. Childers, anyway?
The man displayed a contempt for open government. He relished putting one over his colleagues, most famously in 1994 when he was at the rostrum and rolled over a generally clueless Legislature to pass the nation's toughest antitobacco law.
"All we did was snooker the bastards," Childers said afterward.
The tobacco liability law was cited as a case of the ends justifying the means. It became the signature issue of Gov. Lawton Chiles' long career, pumped billions into the budget and made a handful of trial lawyers wealthy. Those lawyers included Fred Levin, who plotted with Childers to pass the 1994 law and now represents his friend on the Sunshine Law charges.
Childers' roguish behavior generated more humor than outrage in the fantasy world of the Capitol, a place that laughs at the quaint concept of government decisions being made in the light of day and worships, above all, the bottom-line ability to cut deals.
Childers would have been especially proud of the House this week. Speaker Tom Feeney, with Republican and Democratic support, sealed shut a health care bill loaded with special interest provisions. No amendments allowed.
Even ol' W.D. wouldn't dare pull anything like that.
After the term limits broom swept him out of the Capitol two years ago, Senator Childers became Escambia County Commissioner Childers. In hindsight, it appears as if he threw all of those bad-government habits in the back of his truck and headed west on Interstate 10, where he continued to behave as he did when he was in the Legislature.
Until this week, when his past caught up with him.

In Trial, Suspended Official Asks Help of Old Ally
PENSACOLAW.D. Childers has an old friend by his side as the suspended Escambia County commissioner fights charges of violating Florida's Sunshine Law.
Childers, a former Florida Senate president, and Fred Levin, one of the nation's most successful civil trial lawyers, have faced some serious jams and experienced success together for more than two decades.
Their friendship figured in a power struggle that resulted in a near fistfight on the Senate floor. Years later, they *626 worked to push through a law that led to Florida's $13-billion tobacco settlement.
Levin represented Childers in a grand jury investigation. Childers testified on Levin's behalf when the Florida Bar accused him of illegal gambling.
Now facing the most serious predicament of his political career, Childers again has turned to Levin for help.
The Pensacola Republican goes to trial Monday on charges that he illegally discussed public business in private with other commissioners. He also was indicted last week on two felony counts of bribery and one of money laundering. No trial date has been set on those charges.
After 30 years, term limits forced Childers from the Senate. He was elected to the Escambia County Commission in 2000. Gov. Jeb Bush removed him and three other commissioners from office after they were indicted.
Childers, 68, was effusive about Levin in a 1999 interview.
"As an attorney? Best there is," Childers said. "He brings his lunch with him."
In a recent interview, Levin, 65, was equally enthusiastic in praising Childers.
Levin said Childers did not knowingly violate the Sunshine Law, but acknowledged that Childers' combative style may have contributed to his legal predicament.
"Unfortunately, I think he's getting a little older," Levin said. "Like so many of us, you get a little crotchety."
Former Gov. Reubin Askew was a partner in Levin's law firm when he was elected governor in 1970. That was the same year Childers, then a Democrat, won Askew's old Senate seat.
Neither Askew nor Levin saw eye-to-eye with Childers in those days. Levin's specialty is suing insurance companies on behalf accident victims and Childers then supported restricting such lawsuits.
A candidate who unsuccessfully tried to unseat Childers in 1976 received only one outside contribution: Levin's.
"I can't even remember the guy's name," Levin said, but Childers didn't forget.
Their relationship took a turn when Levin testified against a bill sought by insurers to limit victim lawsuits before Childers' Senate committee.
Childers, impressed by Levin's presentation, deserted the insurance industry and voted with the majority to defeat the bill. He then asked the lawyer to his office for a chat.
Levin recalled being relieved as he got up to leave because Childers apparently had forgotten the contribution to his opponent. Just then, Childers asked if Levin thought that candidate could have killed the bill for him.
Their friendship was cemented in 1980 when Levin represented Childers, then designated as the Senate's next president, during a grand jury investigation.
Jurors found that Childers had done nothing wrong in trying to get the state to buy park land from a business associate.
Childers rose to the presidency due largely to his friendship with the late Sen. Dempsey Barron, then the Legislature's craftiest power broker.
Barron, an insurance company lawyer from Panama City, once disagreed with a bill being considered and went to Childers and Levin, the new Senate president's $1-a-year legal advisor, to demand that it be killed.
Childers refused.
"There was an explosion," Levin said. "There was screaming and yelling."

*627 The bill passed, but Barron forged a coalition of Republicans and Democrats that stripped Childers of power. Other senators had to restrain the former friends when they confronted one another on the Senate floor.
In 1990, Childers vouched for Levin's integrity at a Florida Bar hearing, but he was unable to prevent the state Supreme Court from reprimanding Levin for gambling.
Four years later, Childers teamed with Levin and Gov. Lawton Chiles to pass a law making it easier for the state to sue tobacco companies to recover the costs of treating sick smokers.
Lawyers on the state's case, including Levin, made millions. Levin donated $10-million of his share to the University of Florida.
Levin denied that Childers had helped him benefit from the state's tobacco suit. Levin said Childers had instead persuaded Chiles to remove him from the case, arguing that he had a conflict due to his involvement in passing the law.
"I never dreamed that there was ever going to be any benefit to this thing," Levin said, adding that he thought the suit would be costly, with little chance of success.
Instead, he recruited the lawyers that represented the state.
"Later, I got back in," he said, "but it had nothing to do with W.D."
It is possible that some members of the public might believe that Mr. Levin's good fortune in making millions of dollars on the tobacco litigationactually "a third of a billion dollars" according to a May 2, 2002, column in the Northwest Florida Daily Newshad nothing to do with his personal relationship with Mr. Childers, or with his personal relationship with Governor Chiles, or with the fact that he was allowed to recruit the lawyers who would represent the state in the tobacco litigation. But I doubt that many members of the public would have such beliefs after reading news accounts such as those quoted above. At the very least, after reading those accounts, most members of the public would believe that Mr. Childers and Mr. Levin are extremely close personal and political allies, that they both had a close personal and political relationship with Governor Chiles, that their close relationship with one another and with Governor Chiles ultimately resulted in Mr. Levin's firm receiving hundreds of millions of dollars from litigation made possible by a law adopted as a result of a legislative "scam" orchestrated by the three of them, that Mr. Levin was Mr. Childers's long-time personal attorney, and that Mr. Levin was personally representing Mr. Childers on various criminal charges growing out of his actions as an Escambia County commissioner whenand for some period of time afterthe indictment was handed down in the present case.
During his tenure as governor, Lawton Chiles appointed nine judges to this court. The very first of these appointments went to Fred Levin's 39 year-old law partner, Charles Kahn. It is certainly possible that neither Judge Kahn's senior law partner, Mr. Levin, nor Mr. Levin's well-placed friend, Senator Childers, exercised their reputed considerable influence with their friend, Governor Chiles, in seeking Judge Kahn's appointment to this court. It is even possible that Judge Kahn's relationship with the governor's friend, Mr. Levin, had nothing to do with the governor's decision to appoint Judge Kahn. But a member of the public familiar with the reported relationships between these persons, and also familiar with the realities of the political process, would not be considered unduly cynical to doubt these possibilities.
*628 When Mr. Childers's appeal from his convictions in this case was assigned to a panel of this court, Judge Kahn was a member of that panel. Oral argument was heard by the panel on November 9, 2004, and it was apparent from Judge Kahn's persistent questioning of the assistant attorney general assigned to the appeal that Judge Kahn found merit in Mr. Childers's argument that he had been denied the opportunity to fully develop, through cross-examination, critical state witness Willie Junior's bias and motive to testify falsely. (A video of the oral argument can be viewed at this court's website.)
At the time of the oral argument, a reversal on the cross-examination issue would likely have resulted in a new trial for Mr. Childers, but subsequent developments revealed that reversal on the cross-examination issue might result in Mr. Childers not being required to further answer for the crimes for which he had been convicted. News reports contained in the Pensacola News Journal revealed that Willie Junior disappeared on the evening of November 9, 2004, and that his body was found in the crawl space beneath a house in Pensacola a month later, dead from ingestion of a lethal quantity of antifreeze. Mr. Junior's death seemingly added additional significance to Mr. Childers's appeal because Mr. Junior would be unavailable to testify in a new trial. In light of the recent decision of the United States Supreme Court in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), it appears unlikely that evidence of Mr. Junior's former trial testimony would be admissible in a new trial following a holding by this court that the defense had not been afforded an adequate opportunity to cross-examine Mr. Junior. And in light of the importance of Mr. Junior's testimony to the state's case, it also appears unlikely that the state would be able to prove its case upon a retrial without this testimony. (Mr. Junior's death obviously had no impact upon this court's en banc decision. His death and its likely legal implications are recounted here only to reflect the resulting heightened importance of this court's decision, from the perspective of Mr. Childers and his friends.)
In June 2005, a divided panel reached its proposed decision in this case. The majority opinion, authored by Judge Kahn, proposed to reverse Mr. Childers's convictions based upon the argument that Mr. Childers had been denied an adequate opportunity to cross-examine Mr. Junior. A dissenting judge disagreed, concluding that the cross-examination issue should be decided in accordance with the reasoning later reflected in the en banc majority opinion. Accordingly, if this panel decision had stood, Mr. Childers's convictions would have been reversed on a ground making retrial unlikelythus likely extricating Mr. Childers from what the June 23, 2002, St. Petersburg Times article called "the most serious predicament of his political career." And the deciding vote on this decision would have been cast by Fred Levin's former law partner.
Less suspicious members of the public familiar with the information contained in the articles quoted above and also familiar with Judge Kahn's former association with Mr. Levin and his firm would have found it inappropriate for Judge Kahn to have participated in the case. And more suspicious members of the public would have assumed that Judge Kahn had simply returned past favors provided to him by Mr. Levin and Mr. Childers, thus allowing them, once again, to "snooker the bastards."
Before the proposed panel decision was filed, another judge of this court moved for *629 en banc consideration of this case. I cast my vote in favor of the motion.
One of my mentors was Circuit Judge Ben Willis, who served for many years as the chief judge of the Second Judicial Circuit. I was honored to have him speak at my investiture as a judge of this court many years ago. Judge Willis's remarks included a story with a concluding observation. He told the audience that he had himself been invested as a circuit judge on the very day this court came into existence, July 1, 1957, and that after Governor Collins spoke at the investiture of the first judges of this court he then walked over to the Leon County Courthouse to speak at Judge Willis's investiture. Judge Willis explained that it was especially meaningful to him that his judicial service and that of this court's first judges had begun on the same day, because he so greatly admired this court. After naming and praising the work and integrity of a number of this court's former judges he particularly admired, he concluded with this observation: "I don't know of this court ever having been the subject of a breath of scandal."
Although Judge Willis's comments might seem unremarkable to some, they have special meaning for me. I was honored to become a member of a court respected by the public for its integrity, honor, and impartiality, and possessed of a record unblemished by public suspicion. This court is still deserving of this reputation. It is comprised of dedicated judges who, from my perspective, work very hard to impartially decide the cases assigned to them in accordance with the requirements of law. But this reputation will not survive if we are oblivious to public perceptions.
The law sometimes requires us to decide cases in ways that displease members of the public. There is nothing that we can do about that. It is an occupational hazard required by the oath we take. But we should never perform our responsibilities in a manner that would cause the public to question the impartiality of our decisions. Yet, I believe that is precisely what Judge Kahn did by failing, on his own motion, to recuse himself from consideration of this case.
If the public's perception of Judge Kahn's commitment to impartiality were the only concern here, I might not have voted for en banc consideration of this case. But far more is involved. In light of the composition of the original panel, the proposed panel decision would have been a reflection upon this entire court and would have provoked far more than a mere "breath of scandal." Because I dearly value the respect this court rightly deserves for the integrity of its judges and for the impartiality of its decisions, I cast my vote for consideration of this case by the full court, not to affect the outcome of the ultimate decision but to see that the ultimate decision of this court is made by judges unblemished by public suspicion. The threat this case presented to the reputation of this court, in my judgment, made it a case of exceptional importance.
PADOVANO, J., concurring.
Although I am in full agreement with the majority opinion on the motion to certify, I consider it appropriate, in view of the comments made in the dissenting opinion, to explain my reasons for voting to hear this case en banc. I believe that the original panel decision was fundamentally flawed and that it would have ultimately undermined an important principle of law. If the opinion had been allowed to stand, it would have had a profound negative impact on the way criminal cases are tried. This I considered to be a matter of exceptional importance.
*630 The argument made in the initial brief was that the state's motion to revoke Mr. Junior's plea agreement should be introduced into evidence because it is the equivalent of an admission by a party opponent. The theory advanced to support this argument was that the prosecutor must have doubted that Junior was telling the truth or he would not have sought to revoke the agreement. From this supposition, the argument moves on to a conclusion that the jury should have been informed about the state's motion to revoke Junior's plea agreement. This is where the argument breaks down.
Assuming that the actions of a lawyer in filing a motion could somehow be treated as an admission or statement by the party the lawyer represents, that alone would not justify the presentation of evidence regarding the filing of the motion. Section 90.803(18)(a) provides that a statement by a party opponent is "not inadmissible" on the ground that it is hearsay; but that does not necessarily mean that the statement is admissible. If the statement should be excluded on some other ground, for example that it is not relevant, then it should be excluded whether it is hearsay or not.
A statement is not admissible merely because it is not hearsay, but this is the main premise of the argument Mr. Childers made on appeal. The fallacy of his argument is that it conflates principles that belong to the subject of hearsay with those that belong to the subject of relevance. Evidence is not relevant and therefore admissible merely because it is not hearsay.
This fundamental error permeated the discussion during the oral argument of this case, and I believe that it eventually led the panel to analyze the case incorrectly. The critical point that was overlooked in the panel's analysis is that a prosecutor's personal belief about the credibility of a witness is irrelevant. In fact, the Florida courts have gone to great lengths to make sure that a prosecutor's personal belief is not presented to a jury. This is the part of the original panel decision that concerned me the most.
If we accept the proposition that the defense can present evidence tending to show that the prosecutor does not believe a witness, then we must also accept the proposition that the state is entitled to present evidence tending to show that a prosecutor believes a state's witness or disbelieves the defendant. Yet in an unbroken line of cases dating back to 1907, the Florida courts have held that it is improper to allow a prosecuting attorney to comment on the credibility of a witness or the guilt of the defendant. See Martinez v. State, 761 So.2d 1074, 1081 (Fla. 2000); Gore v. State, 719 So.2d 1197, 1201 (Fla.1998); Grant v. State, 171 So.2d 361, 365 (Fla.1965); Tyson v. State, 87 Fla. 392, 394, 100 So. 254, 255 (Fla.1924); Adams v. State, 54 Fla. 1, 45 So. 494 (Fla.1907); Cartwright v. State, 885 So.2d 1010, 1015 (Fla. 4th DCA 2004); Keyes v. State, 804 So.2d 373, 375-376 (Fla. 4th DCA 2001); Lavin v. State, 754 So.2d 784, 785-786 (Fla. 3d DCA 2000); D'Ambrosio v. State, 736 So.2d 44, 47-48 (Fla. 5th DCA 1999); Pacifico v. State, 642 So.2d 1178, 1183-84 (Fla. 1st DCA 1994); Conley v. State, 592 So.2d 723, 731 (Fla. 1st DCA 1992); Riley v. State, 560 So.2d 279, 280 (Fla. 3d DCA 1990); Jones v. State, 449 So.2d 313, 314-315 (Fla. 5th DCA 1984); Harris v. State, 414 So.2d 557, 558 (Fla. 3d DCA 1982); Buckhann v. State, 356 So.2d 1327, 1328 (Fla. 4th DCA 1978); Reed v. State, 333 So.2d 524, 525 (Fla. 1st DCA 1976); Price v. State, 267 So.2d 39, 40 (Fla. 4th DCA 1972).
When I considered the motion to hear the case en banc, it seemed to me that the *631 panel never fully appreciated the gravity of the error it was about to commit. This error is, in my view, best illustrated by a statement made in Chief Judge Kahn's dissent to the en banc decision on the merits. There Judge Kahn stated that the attempted revocation of Junior's plea agreement should have been admitted in evidence because "it would have tended to show that the State entertained serious doubts about the credibility of its key witness."
With all due respect, I believe that this statement would undermine nearly one hundred years of Florida law. From the first reported opinion on this subject to the most recent, Florida courts have consistently held that a prosecutor may not offer an opinion on the credibility of a witness or the guilt of the defendant.
The Florida Supreme Court has observed that an expression by the prosecutor of his personal belief about the defendant's guilt is "antithetical to his responsibilities as an officer of the court," Gore v. State, 719 So.2d at 1202, and "[i]t ill becomes those who represent the State in the application of its lawful penalties to themselves ignore the precepts of their profession and their office." Bertolotti v. State, 476 So.2d 130, 133 (Fla.1985) (emphasis in original). "Competent counsel avoid such breaches of legal propriety and the courts will scrutinize such offensive conduct with great care." Grant, 171 So.2d at 365. "It is the responsibility of the prosecutor to seek justice, not merely to convict. That responsibility will be more nearly met when the jury is permitted to reach a verdict on the merits without counsel indulging in appeals to sympathy, bias, passion or prejudice." See Harris v. State, 414 So.2d 557, 558 (Fla. 3d DCA 1982).
Moreover, as our supreme court has observed, considerable prejudice arises in the minds of the jurors when they hear a representative of their government personally vouching for the soundness of the case against the defendant:
It is particularly improper, even pernicious, for the prosecutor to seek to invoke his personal status as the government's attorney or the sanction of the government itself as a basis for conviction of a criminal defendant.
The power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says. That same power and force allow him... to impress on the jury that the government's vast investigatory network, apart from the orderly machinery of the trial, knows that the accused is guilty or has non-judicially reached conclusions on relevant facts which tend to show he is guilty.
Ruiz v. State, 743 So.2d 1, 4 (Fla.1999) (quoting United States v. Garza, 608 F.2d 659, 662 (5th Cir.1979)).
The present case involves an effort by the defense to place a prosecutor's opinion before the jury, but the rule can be no different in this situation. As the cited opinions illustrate, there is a real danger in allowing a prosecutor to state an opinion on the credibility of a witness. Florida courts have never allowed this kind of testimony, and it would take very little imagination to understand and appreciate the problems we would be creating if we allowed it now in this case.
I recognize that Mr. Childers has also argued that the prosecutor's attempt to revoke the plea agreement goes to the bias of the witness, and that there is at least some argument that could be made that the evidence is therefore logically relevant. But the probative value of this evidence is so attenuated that it has little if any real *632 value. Junior defeated the motion. One would have to assume that he believed he was on thin ice and would therefore be predisposed to testify favorably for the state on the fear that they might file the motion again. This is a speculative assumption, which, in my view, is no more than a pretext to support the ultimate goal of placing before the jury evidence that the prosecutor did not believe his own witness. Consequently, the exclusion of this evidence was not error. Even if the trial judge was mistaken to say that the evidence was not logically relevant, he would have been duty bound to hold that it was legally irrelevant and therefore inadmissible under section 90.403. Florida law simply does not allow a jury to be told of a lawyer's opinion regarding the credibility of a witness.
For these reasons, I considered this case to be a case of exceptional importance and voted to hear the case en banc. It is true, as Judge Ervin has said, that the term "exceptional importance" is not defined in Rule 9.331, but I do not think that it is such a bad thing that appellate judges are left to use their own judgment about this. Perhaps we have become so accustomed to guidelines and standards imposed by others that we have begun to think that we cannot judge without them. I don't think that is the case. To the contrary, I think that this is an area that is best left to the discretion of appellate judges.
It appears to me that the Florida Supreme Court did not intend to interject itself into the day-to-day application of the en banc rule, but rather that the court thought it would be best to allow the district courts to interpret and apply the rule on their own. This conclusion is supported by the supreme court's decision in Chase Federal Savings & Loan Association v. Schreiber, 479 So.2d 90 (Fla.1985). There the court held that the district courts are free to develop their own standard of decisional uniformity in deciding whether to grant en banc hearings and rehearings. It is logical to assume that the supreme court holds the same view about the proper interpretation and application of the term "exceptional importance." This part of the rule was added after the decision in Chase, but the general point is the same. The supreme court recognized that en banc review is a matter for the district courts.
The supreme court could have defined "exceptional importance" in the text of rule 9.331, but it did not. I think it was wise to avoid such a definition. To say what exceptional importance is would also say what it is not. A limiting definition might prevent this court from correcting its own errors in some cases. In any event, I think this case plainly a case of exceptional importance. Even without the explanation I have given for my own vote, it should be obvious to anyone who is trying to untangle all of the opinions that have been written in this case both on the merits and with respect to the en banc procedure that the case is very important.
It is true that there is an element of subjectivity in separating cases that are of exceptional importance from those that are not. Different judges will have different views about this. But we should not overlook the fact that a case cannot be heard en banc unless a majority of the judges think that it is one of exceptional importance. It is not as though one judge or two or even five can do this with their own subjective opinions about what is important. With all due respect, I think that if a majority of the judges on this court think that this case is a case of exceptional importance, those judges who disagree should simply accept the court's decision. It does the judicial system no good to question why some judges believed it was proper.
*633 I would be concerned about the absence of standards for the definition of the term "exceptional importance" if there were some evidence that the en banc rule was being abused, but there is not. This court handles on average about six thousand cases per year, but the number of cases considered en banc is never more than six per year and most often fewer that. All of the rest are decided in panel decisions by the court. On this point, the records kept by our clerk reflect the following:

 ------------------------------------------------
 Number of En Banc
 Year Cases Disposed Dispositions
-------------------------------------------------
 2005 6031 0
-------------------------------------------------
 2004 6112 4
-------------------------------------------------
 2003 5319 2
-------------------------------------------------
 2002 5318 4
-------------------------------------------------
 2001 5363 4
-------------------------------------------------
 2000 5173 1
-------------------------------------------------
 1999 5193 1
-------------------------------------------------
 1998 4707 2
-------------------------------------------------
 1997 5173 5
-------------------------------------------------
 1996 5220 6
-------------------------------------------------

These statistics show that the exceptional importance provision in the en banc rule is not being used capriciously and that it is not being used merely to express disagreement with a panel decision. This court and other appellate courts have been very careful to use this provision only when it is necessary to resolve cases of exceptional importance.
In this concurring opinion, I have highlighted one specific concern about the panel decision in this case, but that should not be taken as an implication that I disagree with any of the other reasons that have been given for hearing this case en banc. In fact, I think it is clear from the entire set of opinions, that there were several good reasons to convene the full court.
WOLF, J., Concurring in part and Dissenting in part.
I would grant certification on the en banc determination; in all other respects I agree with the majority to deny certification.
POLSTON, J., concurring in part, dissenting in part.
I would grant appellant's motion for certification of the merits determination on the evidentiary issue (ground II in the motion) and restitution (ground III in the motion), but not of the en banc determination (ground I in the motion).
KAHN, C.J., dissenting.
I would grant Appellant Childers' motion on several grounds. Most importantly, I believe the supreme court should address the question of the en banc jurisdiction of the district courts of appeal. Both the Florida Constitution and the applicable statute direct the district courts of appeal to consider cases by three-judge panels. See Art. V, § 4(a), Fla. Const.; § 35.13, Fla. Stat. (2004). As expressed briefly in my dissenting opinion, and in much more detail in Judge Ervin's separate opinion, we should ask the supreme court to consider the constitutionality of the en banc procedure and, if appropriate, to establish a firm standard for the jurisdictional boundaries of en banc consideration. I also find other points raised in the motion meritorious.
As presently utilized by this court, en banc consideration almost always involves a motion by a member of the court, as opposed to a motion for rehearing filed by one of the parties pursuant to Florida Rule of Appellate Procedure 9.331(d). With all due respect, the various opinions in this case supporting en banc consideration establish that this court's exercise of its en banc jurisdiction relies solely upon the ability of the moving judge to obtain votes from a majority of judges. This procedure raises, in my mind, a serious due process concern.
*634 The first aspect of the problem, and one that I raise without any sort of accusatory tone, involves the movant judge essentially becoming an advocate on behalf of the question or argument presented in the en banc motion. The second aspect concerns the constitutional dimensions of a court addressing issues not raised, or even briefed, by the parties, and as to which the parties may have no notice whatsoever. This second concern arises due to the fact that motions for en banc consideration are not subject to public disclosure and, by long-standing procedure, circulate only among the judges of this court. Although we, by tradition, notify parties that the case has transitioned into an en banc posture, we do not notify the parties of the question under review, nor do we generally afford the parties an opportunity to be heard on these issues. Deciding cases in such a manner could raise a fundamental due process issue. See, e.g., N.C. v. Anderson, 882 So.2d 990, 993 (Fla.2004) ("Procedural due process requires both reasonable notice and a meaningful opportunity to be heard."). This court should certify to the Florida Supreme Court questions concerning the legality of the hearing en banc procedure, both under the due process clause and Florida's constitutional provision requiring three-judge panels in each case.
So I can be clear, I am not suggesting that our procedure here has been "irregular." In fact, I agree completely with the per curiam opinion on the motion for certification that we regularly take cases en banc before a panel decision issues. The present case suggests, however, that such a procedure is fragile and would benefit from rules known in advance. The cases cited by the per curiam opinion show that we have previously adhered to an understanding that en banc matters would resolve important, and broadly applicable, questions of law, or harmonize the law in this district. See Pullo v. Pullo, 926 So.2d 448, 449 n. 1 (Fla. 1st DCA 2006) (invoking en banc process to resolve direct conflict between two panel opinions of court); Checkers Rest. v. Wiethoff, 925 So.2d 348, 350 (Fla. 1st DCA 2006) (invoking en banc process to clarify waiver provision of section 440.20(4), Florida Statutes, in light of several recent opinions that "blurred the distinction between compensability and entitlement to benefits"); Bay Point Club, Inc. v. Bay County, 890 So.2d 256, 257 (Fla. 1st DCA 2004) (invoking en banc procedure "to maintain uniformity of this court's decisions"); Sanders v. State, 847 So.2d 504, 505 (Fla. 1st DCA 2003) (invoking en banc procedure "to recede from a line of authority holding that such a claim is a colorable claim"); Chavarria v. Selugal Clothing, Inc., 840 So.2d 1071 (Fla. 1st DCA 2003) (invoking en banc procedure to clarify both case law and statutory law regarding JCC's consideration of expert medical testimony); Jupiter v. State, 833 So.2d 169, 171 (Fla. 1st DCA 2002) (invoking en banc procedure to recede from decision that "failed to recognize the effect of the clear language of the applicable rule of criminal procedure"); Fisher v. Int'l Longshoremen's Ass'n, 827 So.2d 1096, 1098 (Fla. 1st DCA 2002) (invoking en banc procedure to recede from prior decision that was an "anomaly in this district"); Brooks v. State, 816 So.2d 199 (Fla. 1st DCA 2002) (invoking en banc procedure invoked to determine whether attorney rendered ineffective assistance of counsel for not filing appeal even though defendant failed to request one); Orange County Fire Rescue v. Antonelli, 794 So.2d 758, 759 (Fla. 1st DCA 2001) ("[O]ur affirmance on the first issue requires us to recede en banc from prior decisions of this court."); Jones v. State, 790 So.2d 1194, 1196 (Fla. 1st DCA 2001) ("We have decided to hear this case en banc to resolve a conflict in *635 our opinions regarding the applicable standard of review."); Morris v. State, 789 So.2d 1032 (Fla. 1st DCA 2001) (exercising en banc jurisdiction to consider whether defendant's verbal act of telling child that he desired to engage her in oral sex was lewd or lascivious act); Wilcox v. State, 783 So.2d 1150, 1150 (Fla. 1st DCA 2001) (invoking en banc procedure to "recede from Lee [v. State, 766 So.2d 374 (Fla. 1st DCA 2000) ]"); Closet Maid v. Sykes, 763 So.2d 377 (Fla. 1st DCA 2000) (invoking en banc process to explain new major contributing cause standard for workers' compensation); Sailor v. State, 733 So.2d 1057 (Fla. 1st DCA 1999) (invoking en banc procedure to determine whether trial court may constitutionally change venue over criminal defendant's objection); Trowell v. State, 706 So.2d 332, 333 (Fla. 1st DCA 1998) (invoking en banc procedure because, "[this] court's decision in Thomas [v. State, 626 So.2d 1093 (Fla. 1st DCA 1993),] is inconsistent with a substantial body of case law from this court and other district courts of appeal"), approved by 739 So.2d 77 (Fla.1999); Hadden v. State, 670 So.2d 77 (Fla. 1st DCA 1996) (invoking en banc procedure to determine if expert testimony regarding whether child's symptoms are consistent with those of child who has been sexually abused is subject to Frye standard), approved in part, quashed in part by 690 So.2d 573 (Fla.1997); Champlovier v. City of Miami, 667 So.2d 315, 316 (Fla. 1st DCA 1995) (invoking en banc procedure to clarify that "[t]he policy in Florida which strongly favors finality of judgments is applicable whether a judgment is reached through contest or consent"); E. Airlines v. Griffin, 654 So.2d 1194, 1196 (Fla. 1st DCA 1995) (invoking en banc procedure to "recede from our decision in Fawaz [v. Florida Polymers, 622 So.2d 492 (Fla. 1st DCA 1993),] to the extent it limits the discretion of the judge of compensation claims in granting relief from stipulations beyond that contemplated by Rule 4.130"); Publix Supermarkets v. Finocchi, 650 So.2d 1122 (Fla. 1st DCA 1995) (invoking en banc procedure to consider proper application of special errand doctrine); Publix Super Markets, Inc. v. McGuire, 650 So.2d 151 (Fla. 1st DCA 1995) (invoking en banc procedure on remand from McGuire v. Publix Super Markets, Inc., 640 So.2d 1079 (Fla.1994), quashing 629 So.2d 862 (Fla. 1st DCA 1993), to analyze the application of shifting burdens of proof in workers' compensation "heart attack" rule); Vegas v. Globe Sec., 627 So.2d 76 (Fla. 1st DCA 1993) (invoking en banc procedure to consider whether calculation of average weekly wages was altered by new wording in workers' compensation statute); Ullman v. City of Tampa Parks Dep't, 625 So.2d 868, 869 (Fla. 1st DCA 1993) ("We have considered this case en banc in order to more clearly define the role of the JCC as the arbiter of disputed factual matters in workers' compensation cases."); Saffor v. State, 625 So.2d 31 (Fla. 1st DCA 1993) (invoking en banc procedure to analyze rule for admission of collateral crime evidence in case charging sexual abuse in familial context), quashed by 660 So.2d 668 (Fla.1995); Orange County Sch. Bd. v. Perkins, 619 So.2d 1, 3 (Fla. 1st DCA 1993) ("Upon close consideration, we now recede from Jerry Chapman, Inc. [v. Ivey, 448 So.2d 11 (Fla. 1st DCA 1984) ]"); Zundell v. Dade County Sch. Bd., 609 So.2d 1367 (Fla. 1st DCA 1992) (invoking en banc procedure to examine rule for determining whether cardiovascular failure arises in course and scope of employment for workers' compensation purposes), quashed by 636 So.2d 8 (Fla.1994); Jones v. State, 606 So.2d 709 (Fla. 1st DCA 1992) (invoking en banc procedure to determine whether trial court, before imposing habitual offender sentences, must first find underlying predicate offenses were not set aside in post-conviction *636 proceedings), quashed by 616 So.2d 52 (Fla.1993); Lee v. State, 606 So.2d 1222 (Fla. 1st DCA 1992) (invoking en banc procedure to consider whether first degree felonies punishable by life and life felonies are subject to enhancement); Terners of Miami Corp. v. Freshwater, 599 So.2d 674, 675 (Fla. 1st DCA 1992) ("To the extent that [Atlantic Foundation v.] Gurlacz [, 582 So.2d 10 (Fla. 1st DCA 1991),] may be read as standing for such a conclusion, we expressly recede from that decision."); Flanagan v. State, 586 So.2d 1085 (Fla. 1st DCA 1991) (exercising en banc jurisdiction to consider the role of expert witnesses in child sexual abuse cases), approved in part by 625 So.2d 827 (Fla.1993); Burdick v. State, 584 So.2d 1035 (Fla. 1st DCA 1991) (invoking en banc procedure to consider whether habitual felony offender statute was constitutional), approved in part, quashed in part by 594 So.2d 267 (Fla.1992); see also Bush v. Holmes, 886 So.2d 340 (Fla. 1st DCA 2004) (invoking en banc procedure to consider the constitutionality of state-administered school voucher program), aff'd in part by 919 So.2d 392 (Fla.2006); Vause v. Bay Med. Ctr., 687 So.2d 258, 261, 263 (Fla. 1st DCA 1996) (invoking en banc jurisdiction to consider propriety of grant of motion to dismiss "where the affirmative defense does not appear on the face of the prior pleading," clarify immunity rule based upon whether fellow employees "were not engaged in unrelated works," and explain exception to fellow employee immunity for acts of willful and wanton disregard or gross negligence); Slay v. Singletary, 676 So.2d 456, 457 (Fla. 1st DCA 1996) ("We now expressly align ourselves with the decision in Smith [v. State, 659 So.2d 1222 (Fla. 4th DCA 1995),] and to the extent prior cases ... are read to suggest that a sentencing court must do more in order to effect a full award of Green credit[, referring to State v. Green, 547 So.2d 925 (Fla.1989) ], we recede from those opinions."), approved by 688 So.2d 319 (Fla.1997); Jenkins v. State, Dep't of Health & Rehab. Servs., 618 So.2d 749, 754 (Fla. 1st DCA 1993) ("In making this determination, we recede from Cook [v. Division of Personnel, Department of Administration, 356 So.2d 356 (Fla. 1st DCA 1978) ], insofar as it conflicts with our decision in [Board of Regents v.] Heuer [, 332 So.2d 626 (Fla. 1st DCA 1976) ], this case, and the rationale expressed in Tomlinson [v. State, Department of Health & Rehabilitative Services, 558 So.2d 62 (Fla. 2d DCA 1990) ]"). See generally S. States Utils. v. Fla. Pub. Serv. Comm'n, 714 So.2d 1046, 1049 (Fla. 1st DCA 1998) (exercising en banc jurisdiction to overrule a previous case and recede from two previous decisions because "[e]xamining the question anew, we find no statutory basis for our earlier conclusion"); Scantling v. State, 704 So.2d 565, 565 (Fla. 1st DCA 1997) ("[W]e recede from this aspect of Currelly [v. State, 678 So.2d 453 (Fla. 1st DCA 1996) ]."), approved by 711 So.2d 524 (Fla.1998); Sheley v. Fla. Parole Comm'n, 703 So.2d 1202, 1206 (Fla. 1st DCA 1997) ("However, we recede from our decisions to the extent that they hold that an inmate can obtain a second appeal in the district court when mandamus is used as an appellate remedy in the circuit court ...."), approved by 720 So.2d 216 (Fla.1998); Richardson v. State, 698 So.2d 551 (Fla. 1st DCA 1997) (exercising en banc jurisdiction to consider whether defendant who has been sentenced as habitual felony offender for two or more offenses arising out of single criminal episode may have sentences further enhanced by order that they run consecutively); J.B. v. State, 689 So.2d 360, 360 (Fla. 1st DCA 1997) ("To the extent that Farley [v. City of Tallahassee, 243 So.2d 161 (Fla. 1st DCA 1971),] may be read as suggesting that such preservation is not required, we would now *637 abandon this interpretation."), approved by 705 So.2d 1376 (Fla.1998); Ganyard v. State, 686 So.2d 1361 (Fla. 1st DCA 1996) (invoking en banc procedure to consider whether criminal defendant has the right to be present whenever peremptory challenges might be used), approved by 705 So.2d 567 (Fla.1998); N. River Ins. Co. v. Wuelling, 683 So.2d 1090, 1092 (Fla. 1st DCA 1996) ("[W]e recede from our decision in Waffle House v. Hutchinson, 673 So.2d 883 (Fla. 1st DCA 1996)...."); Singletary v. Jones, 681 So.2d 836, 837 (Fla. 1st DCA 1996) ("Because the department is questioning the ruling in Buffa [v. Singletary, 652 So.2d 885 (Fla. 1st DCA 1995) ], and we conclude that we should recede from that decision, this case is being considered en banc by the court's criminal division pursuant to Florida Rule of Appellate Procedure 9.331(b).").
Turning to the en banc merits opinion, I would grant the motion in two respects. The first point questions the propriety of an opinion that applies the "tipsy coachman" rule under the present circumstances. In the instant case, the trial court ruled that the evidence at issue did not meet the statutory standard of relevance. See § 90.401, Fla. Stat. (2002). The majority affirmed, reasoning that, even though the trial court erred on its determination of relevance, the ruling should nevertheless be upheld because the evidence in question should have been excluded under section 90.403, Florida Statutes. If any one statute on the books in Florida, and particularly any statute in the Evidence Code, begs the exercise of sound discretion by a trial judge, it is section 90.403. Beyond question, the Florida Supreme Court has recognized this principle:
This statute compels the trial court to weigh the danger of unfair prejudice against the probative value. In applying the balancing test, the trial court necessarily exercises its discretion.
State v. McClain, 525 So.2d 420, 422 (Fla. 1988); see Walker v. State, 707 So.2d 300, 309 (Fla.1997). Accordingly, trial courts are possessed of broad discretion in making determinations under section 90.403. See, e.g., Heath v. State, 648 So.2d 660, 664 (Fla.1994); McClain, 525 So.2d at 422. The question of bias, at issue in the present case, "is subject to balancing under the provisions of section 90.403, and a trial court's determination of how far an inquiry into bias may proceed is within the trial court's discretion." Tobin v. Leland, 804 So.2d 390, 393 (Fla. 4th DCA 2001).
By its application of the "tipsy coachman" rule in the present case, the majority has essentially applied a trial court standard of discretion in a case where the trial court never exercised discretion itself. As a result, this court's application of its own discretion under section 90.403 is not subject to review under any standard and, arguably, the whole purpose of the statute has been defeated because the trial court has never made the critical, initial consideration. One struggles to understand how this court can weigh in on an abuse of discretion question in the absence of a trial court's exercise of discretion. Moreover, we should not ignore the fact that the State has never argued or briefed the point upon which the majority has now affirmed.
Also, I would acknowledge express and direct court conflict between our decision in this case and numerous other decisions on the question of whether a county may be a "victim" as that term is used in section 775.089, Florida Statutes. My separate opinion in this case sets out the other district court decisions directly conflicting with the position taken by our majority here. See Childers v. State, 936 So.2d 585, 604 n. 2 (Fla. 1st DCA 2006) (Kahn, C.J., concurring in part and dissenting in part). *638 As the supreme court may establish jurisdiction based upon this conflict, it need not limit its review to that single issue, but may review the entire case. See, e.g., State v. T.G., 800 So.2d 204, 210 n. 4 (Fla.2001) ("[O]nce the Court grants jurisdiction, it may, in its discretion, address other issues properly raised and argued before the Court."); Jacobson v. State, 476 So.2d 1282, 1285 (Fla.1985) ("Having jurisdiction, we have jurisdiction over all issues...."); Savoie v. State, 422 So.2d 308, 310 (Fla.1982) ("[O]nce we accept jurisdiction over a cause in order to resolve a legal issue in conflict, we may, in our discretion, consider other issues properly raised and argued before this Court."); see also Battle v. State, 911 So.2d 85, 90 (Fla.2005) (Quince, J., concurring in part and dissenting in part) ("[O]nce this Court accepts jurisdiction over a cause in order to resolve a legal issue in conflict, we have jurisdiction over all issues."); Sanchez v. Wimpey, 409 So.2d 20, 23 (Fla.1982) (Sundberg, C.J., concurring in part and dissenting in part) ("[T]he very language of our jurisdictional authority implies that the entire decision of the district court is to be reviewed and not just particular issues within the decision.").
We should grant the motion for certification in part. On the en banc issue, we should certify the following questions:
(1) DOES A HEARING EN BANC, UNDER RULE 9.331(c), FLORIDA RULES OF APPELLATE PROCEDURE, PURSUANT TO THE "EXCEPTIONAL IMPORTANCE" PROVISION OF RULE 9.331(a), VIOLATE
(A) THE DUE PROCESS CLAUSE OF THE FLORIDA OR FEDERAL CONSTITUTIONS, OR
(B) ARTICLE V, SECTION 4(a), OF THE FLORIDA CONSTITUTION PROVIDING, "THREE JUDGES SHALL CONSIDER EACH CASE AND THE CONCURRENCE OF TWO SHALL BE NECESSARY TO A DECISION"?
(2) DOES THE "EXCEPTIONAL IMPORTANCE" PROVISION OF RULE 9.331(a), FLORIDA RULES OF APPELLATE PROCEDURE, ESTABLISH A JURISDICTIONAL THRESHOLD?
(3) IF THE RULE DOES ESTABLISH A JURISDICTIONAL THRESHOLD, WHAT IS THAT THRESHOLD?
On the majority's rationale for affirming, we should certify the following question:
MAY A DISTRICT COURT OF APPEAL UTILIZE THE "TIPSY COACHMAN" DOCTRINE BY APPLYING SECTION 90.403, FLORIDA STATUTES, IN A CASE WHERE THE TRIAL COURT HAS NEVER EXERCISED ITS DISCRETION CONCERNING THE ADMISSIBILITY OF THE PARTICULAR EVIDENCE IN QUESTION?
Finally, we should certify direct and express conflict on the restitution question.[1]
NOTES
[1] Although not germane to the opinions on the present motion, other members of the court have stated that the original panel decision in this case was 2-1 for reversal. The proposed 2-1 decision was not the original panel opinion. The internal records of this court show that I initially released the panel opinion for circulation among the judges of this court on January 11, 2005, and that the opinion was unanimous in favor of reversal of a conviction and affirmance of the trial court's ruling on restitution. One panel member authored a special concurring opinion. The opinion had a scheduled public release date of January 31, 2005. At the request of a member of this court, I withdrew the opinion from release on January 27, 2005. Between January and May, one of the members of the original panel changed his vote, thus resulting in the second panel opinion, this time a 2-1 opinion in favor of reversal.